**UNITED STATES of America, Appellee,**

v.

**George Alvin BRUTON, Appellant.**

**No. 80–1930.**

United States Court of Appeals,
Eighth Circuit.

Submitted Feb. 12, 1981.

Decided May 6, 1981.

Rehearing and Rehearing En Banc Denied June 3, 1981.

Steven N. Snyder, Asst. U. S. Atty., Fort Smith, Ark., for appellee.

Jerry D. Pruitt, Fort Smith, Ark., for appellant.

Before LAY, Chief Judge, STEPHENSON and ARNOLD, Circuit Judges.

ARNOLD, Circuit Judge.

George Alvin Bruton appeals his convictions for assaulting a federal officer with a deadly weapon in violation of 18 U.S.C. § 111 (Count I) and possession of firearms by a convicted felon in violation of 18 U.S.C. App. § 1202(a)(1) (Count II). We affirm.

## I.  The Facts and Proceedings Below

On December 13, 1979, F.B.I. agents in northwest Arkansas learned that Bruton, who was being sought on two federal fugitive warrants, was probably in the Fort Smith, Arkansas, area. He was believed to be in the company of Gerald Wayne Prince, a fugitive from Texas. The information, which came from a confidential informant, indicated that Mr. Bruton was driving a red Ford Ranchero truck, was living at the Hickory Grove Mobile Home Park, and was in possession of firearms and explosives.

During the early morning hours of December 14, 1979, ten F.B.I. agents assembled in and near the mobile home park for a stakeout of Bruton's mobile home. At approximately 11:45 that morning Bruton came out of his mobile home and locked one of the two outside doors with a padlock. He got into his Ford Ranchero and started driving out of the park. One vehicle, occupied by F.B.I. agents, pulled in front of his truck, blocking its path. An agent got out of the car, identified himself as an F.B.I. agent, and yelled for Bruton to stop. Bruton put his truck into reverse and backed into a van which other agents had positioned behind him. As Bruton's truck came to rest against the van, agents disabled his truck by shooting into the radiator and the back tires. A shotgun blast sprayed his windshield, and he ducked below the back of the front seat. When Bruton rose again, he was holding a pistol and got out of the truck. He was hit by a shotgun blast and fell to the ground. His pistol was fired once, but he denies knowingly firing a shot.

Several of the agents surrounded Bruton, who was lying on the ground near the bay window at the south end of his mobile home. The agents who surrounded him stood near the window for several minutes. Almost immediately after the shootout, Agents Hardin and Juel entered the mobile home through an unlocked window. Agent Juel provided cover as Hardin climbed in by aiming his shotgun through the window and down the hall which ran the length of the mobile home. Agents testifying at the trial characterized this search as a security or "sweep search." As they walked through the mobile home, the agents called out that there were long guns, short guns, and narcotics in it. Satisfied that no one was in the mobile home, they left through the window. Nothing was taken from the mobile home during the sweep search. Later that day an affidavit was sworn, and a search warrant was issued. The mobile home was again searched, and several firearms, 23 electric blasting caps, and other personal property were seized. The firearms were introduced as evidence on Count II at the trial.

Gerald Wayne Prince, who the F.B.I. had suspected was with Bruton, was arrested at another residence in Fort Smith about two hours later.

Defendant was indicted in the Western District of Arkansas on April 30, 1980. He appeared on July 16, 1980, with court-appointed counsel and pleaded not guilty to both counts.[1] On August 14, 1980, the court[2] held a hearing to hear defendant's motion to suppress the contents of the search of his mobile home and his motion to inspect the transcripts of the grand-jury proceedings.[3] Both motions were denied in an unreported Memorandum and Order filed August 28, 1980.

Defendant's jury trial began on September 15, 1980, and continued for three days.[4] Defendant was found guilty on both counts. He filed a motion for a new trial on September 19, 1980. On September 22, 1980, he was sentenced to ten years imprisonment and a $10,000 fine on Count I, to run consecutively to a sentence previously imposed in the Western District of Missouri. On Count II defendant was sentenced to two years imprisonment and a $10,000 fine, to run consecutively to the penalty imposed on Count I. On September 30, 1980, the court held a hearing on defendant's motion for a

1. Following his capture in December of 1979 defendant was treated at the Medical Center for Federal Prisoners in Springfield, Missouri. In April of 1980 his parole from the United States Prison in Leavenworth, Kansas, was revoked, and he was committed to that prison to continue serving a previous sentence.

He was returned to the Western District of Arkansas on June 27, 1980, for arraignment, on August 5, 1980, for the suppression hearing, and on August 25, 1980, for trial, pursuant to writs of Habeas Corpus Ad Prosequendum. After each court appearance he was taken back to Kansas. He moved to quash the second and third writs and to dismiss the charges against him on the theory that the United States' failure to bring the proceedings against him to conclusion while he was in federal custody under the first writ mandated dismissal under the provisions of the Interstate Agreement on Detainers Act, 18 U.S.C. App. §§ 1 et seq.

The Agreement requires the dismissal of an indictment against a prisoner whose custody is obtained by a receiving state ("state" being defined by Art. II(a) to include the United States) if he is returned to his original place of imprisonment without first being tried on the indictment underlying the detainer and request by which custody of the prisoner was secured.

The United States is bound by all provisions of the Agreement as both a sending and receiving state. *United States v. Mauro*, 436 U.S. 340, 98 S.Ct. 1834, 56 L.Ed.2d 329 (1978). The provisions of the Agreement are triggered, however, only when a prisoner is moved between two jurisdictions. The Agreement does not apply in the present case, because only one jurisdiction was involved in the transfers. Two parts of the United States are one jurisdiction for purposes of the Agreement. *United States v. Krohn*, 558 F.2d 390 (8th Cir.), *cert. denied*, 434 U.S. 868, 98 S.Ct. 207, 54 L.Ed.2d 145 (1977). For that reason, defendant's argument fails.

2. The Honorable William R. Overton, United States District Judge for the Eastern District of Arkansas, sitting by designation.

3. Defendant's motion to be allowed additional expenses for a private investigator was granted.

4. The Honorable Paul X Williams, Chief Judge of the United States District Court for the Western District of Arkansas, presided at the trial and the hearing on motion for new trial.

new trial. Defendant moved for a continuance after several witnesses he had subpoenaed failed to appear. The motion was denied, and the motion for a new trial was also denied. This appeal followed. Bruton makes a number of contentions, and we will discuss them in turn.

II. Motion To Suppress Evidence

■ The district court denied the motion to suppress the evidence seized from Bruton's mobile home, finding that there were exigent circumstances for entering the mobile home after Bruton's arrest. The trial court's findings on a motion to suppress are subject to the clearly-erroneous standard of review. *United States v. Williams*, 604 F.2d 1102, 1121 (8th Cir. 1979); *United States v. Kulcsar*, 586 F.2d 1283 (8th Cir. 1978). We find ample evidence in the record to support the court's findings.

■ The United States has the burden of establishing that exigent circumstances justified the warrantless search of the defendant's home.[5] Such a search is *per se* unreasonable under the Fourth Amendment unless it falls within one of the few "specifically established and well-delineated exceptions." *Coolidge v. New Hampshire*, 403 U.S. 443, 455, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564 (1971). One such exception to the warrant requirement is the so-called "sweep search" incident to an arrest, when police officers suspect that an armed accomplice may be close by. *United States v. Young*, 553 F.2d 1132, 1134 (8th Cir.), *cert. denied*, 431 U.S. 959, 97 S.Ct. 2686, 53 L.Ed.2d 278 (1977); *United States v. Briddle*, 436 F.2d 4, 7 (8th Cir. 1970), *cert. denied*, 401 U.S. 921,

91 S.Ct. 910, 27 L.Ed.2d 824 (1971). Compare *United States v. Bozada*, 473 F.2d 389 (8th Cir.) (en banc), *cert. denied*, 411 U.S. 969, 93 S.Ct. 2161, 36 L.Ed.2d 691 (1973).

■ Agent Hardin, who entered the mobile home after Bruton was disabled, testified at the suppression hearing to the following reasons for entering:

Question: I am going to ask you why you went in the mobile home?

Answer: It was a combination of several reasons. First, as I explained, the F.B.I. during the course of the investigation to locate and apprehend Mr. Bruton, had become very familiar with his methods of operation; the fact that he had a previous conviction for the storage of explosives and the presence of firearms; the fact that he, at least we thought he was in the presence of one or more persons for whom there were warrants outstanding, possibly residing with him in that particular trailer. If not—that trailer park.

The fact that on viewing that scene that morning and the information the other agents had developed during the night that there were two vehicles parked at that particular trailer, a red Ranchero and a sedan car, and the fact that there are numerous other persons living close to this particular trailer in other trailer homes, and the fact that Mr. Bruton was on the ground and the agents were standing around doing their assigned tasks, looking after him, there was quite a responsibility toward him, ourselves, people in the other trailers who wandered out to see what was going on.

---

5. Defendant alleges that the trial court erroneously placed the burden of proving the invalidity of the search of the mobile home and the seizure of the firearms on him. While the court did make such a statement at the beginning of the hearing, it later corrected the statement as follows:

THE COURT [Overton, J.]: Incidentally, I would like to correct something I said earlier when we were discussing the suppression of evidence in this motion, that as the moving party you have the burden. If the Motion develops the question of whether or not there were exigent circumstances to justify the entry into the mobile home, I think the burden is on the government to prove that, not the

defendant to prove the absence of exigent circumstances.

Any doubt about whether the court correctly allocated the burden is dispelled by the court's Memorandum and Order at page 4, which states that "the Government bears the heavy burden of establishing exigent circumstances justifying the entry and search."

If the court was in error in requiring defendant to go forward with the evidence at the suppression hearing, that error was harmless, since the defendant did in fact go forward, and the burden of persuasion was correctly allocated by the court when it considered the evidence.

Question: You were seeking to secure the premises?

Answer: Basically, yes, sir, that's right.

It is also relevant that Gerald Prince, who was suspected to be with Bruton, was a fugitive from Texas, where he was charged with an assault with a firearm on an unarmed person.

Defendant argues that the F.B.I. agents knew at the time they apprehended him that Gerald Prince was at a different location across town, and that they did not act as if they were fearful that another person was in the mobile home because they stood in front of the bay window for several minutes. He also asserts that they had no reason to suspect that Mr. Bruton would have left his home wired with explosives when he did not expect to be arrested that day, and that the fact that he padlocked an outside door showed that no one was inside. Bruton testified that Special Agent in Charge William Kell told him as he was lying on the ground, "George, we got your partner across town."

We agree with the district court that Bruton's arguments might be persuasive, taken in the abstract and viewed with the aid of hindsight. It is not, however, isolated facts, but the totality of the circumstances, that must be considered when a court is called upon to assess the existence of exigent circumstances. Bruton's apprehension involved a shoot-out between him and the F.B.I. He had a history of violent involvement with firearms and explosive devices. There was reason to believe that he was traveling with one or more other fugitives. Innocent by-standers as well as agents were in close proximity to the scene. Under all these circumstances, the agents were justified in checking to see if anyone else was in the mobile home. The question under the Fourth Amendment is whether a search was "reasonable." This standard is flexible, not absolute. In deciding whether it was violated, we should try to put ourselves in the position of the officers right after they had stopped Bruton in a violent confrontation. We should not, in the quiet of our chambers, look with eagle's eyes to spy out flaws in the officers' reasoning after the fact.[6] We realize that entry of a home without a warrant is a drastic step, not to be taken without clear justification. It is true that the officers could have surrounded the mobile home, without entering it, while their colleagues went before a magistrate to ask for a search warrant, which surely would have been forthcoming. We do not think the Fourth Amendment required them thus to expose themselves and members of the public to the very real risk of serious injury. We hold that the district court was well within its rights in finding that the officers acted justifiably to protect themselves and innocent citizens from the potential of further violence.[7]

## III. Pre-trial Inspection of Grand Jury Transcripts

Defendant alleges error in the district court's denial of his motion for pre-trial discovery of grand-jury transcripts pursuant to Fed.R.Crim.P. 6(e)(3)(C). He claimed that the evidence presented to the Grand Jury would be relevant in the preparation of his defense. At the suppression hearing, the defendant argued that he also needed the transcript in order to impeach government witnesses at the hearing and to refresh their memories. The court rejected his argument, holding that he had failed to show any "particularized need" for the documents, as required by *Dennis v. United States*, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966). Defendant does not

6. We are indebted for the phrase to Blackstone, J., who said, in a different context, that "*after verdict* the Court will not look with eagle's eyes to spy out a variance ...." *Scott v. Shepherd*, 2 W.Bl. 892, 96 Eng.Rep. 525, 527 (C.P.1773) (dissenting opinion) (emphasis in original).

7. Bruton's testimony that Agent Kell told him Prince had already been arrested would, if believed, be a powerful argument in favor of suppression. The district court made no express finding on the point. We know from other evidence, however, that Prince was still at large. We infer that the district court did not believe Bruton. Due regard must be given to its opportunity to judge of the credibility of live testimony. *Cf.* Fed.R.Civ.P. 52(a).

claim that he was denied the use of grand-jury transcripts at the trial of the case, which is his right under the Jencks Act, 18 U.S.C. §§ 3500(b) and (e)(3).[8] The trial transcript reveals that he did use grand-jury testimony in his cross-examination of at least one government witness. The question remains whether he should have been given the grand-jury transcripts before the trial.

■ The established rule in this Circuit is that grand-jury transcripts are generally not available before a witness has testified at trial. *United States v. Pelton*, 578 F.2d 701, 709 (8th Cir.), *cert. denied*, 439 U.S. 964, 99 S.Ct. 451, 58 L.Ed.2d 422 (1978); *United States v. Cole*, 449 F.2d 194, 198 (8th Cir. 1971), *cert. denied*, 405 U.S. 931, 92 S.Ct. 987, 30 L.Ed.2d 806 (1972); *Hanger v. United States*, 398 F.2d 91 (8th Cir. 1968), *cert. denied*, 393 U.S. 1119, 89 S.Ct. 995, 22 L.Ed.2d 124 (1969). Defendant has not shown what good pre-trial disclosure of the transcripts would have done him, other than the general assertion that the transcripts would have been helpful in preparing a defense. Given the well-established policy favoring the secrecy of grand-jury proceedings, that is not enough.

■ Defendant's contention that he should have been allowed to use grand-jury transcripts for cross-examination at the suppression hearing must also fail because there is no showing of any prejudice to him. The government argues that the Jencks Act applies only to require delivery to defense counsel of witnesses' statements after the government has itself called those witnesses to the stand. The government agents were called as witnesses at the suppression hearing by the defendant, not by the government. Defendant replies that he was forced to call the agents as "his own" witnesses by the district court's (assertedly) erroneous ruling that defendant had the duty of going forward with the evidence on the motion to suppress. Whether the district court erred in this respect, we need not now decide, because, as noted, Bruton has not shown that he was prejudiced by not having the statements at the suppression hearing to help him in his questioning of the agents. He has pointed to nothing in the grand-jury transcripts that would have aided his theory that there were no exigent circumstances. As already stated, Bruton's counsel got the transcripts at trial.[9]

## IV. Refusal To Accept Defendant's Stipulation Of Prior Felony

Defendant next contends that the trial court erred in allowing the government to put evidence before the jury of his two previous felony convictions.[10] Count II of the indictment charged Bruton with violating 18 U.S.C. App. § 1202(a)(1), entitled "Unlawful Possession or Receipt of Firearms." That statute reads in relevant part:

(a) Any person who—

(1) has been convicted by a court of the United States or of a State or any political subdivision thereof of a felony,

*       *       *       *       *       *

8. In 1970 a new provision was added to the Jencks Act to include grand-jury testimony as one of the types of statements subject to disclosure to the defendant after a government witness has testified on direct examination at trial. Pub.L.No. 91–452, Title I, § 102, 84 Stat. 926.

9. Quite a few cases hold that a pre-trial hearing is not a "trial" at all within the meaning of the Jencks Act. E. g., *United States v. Murphy*, 569 F.2d 771 (3d Cir.), *cert. denied*, 435 U.S. 955, 98 S.Ct. 1588, 55 L.Ed.2d 807 (1978); *United States v. Spagnuolo*, 515 F.2d 818 (9th Cir. 1975); *United States v. Sebastian*, 497 F.2d 1267 (2nd Cir. 1974); *Robbins v. United States*, 476 F.2d 26 (10th Cir. 1973); *United States v. Montos*, 421 F.2d 215 (5th Cir.), *cert. denied*, 397 U.S. 1022, 90 S.Ct. 1262, 25 L.Ed.2d 532

(1970). We need not decide whether these cases would be followed in this Circuit, nor whether, if they were, there might still be, under some circumstances, a right under the Due Process Clause of the Fifth Amendment to disclosure of grand-jury testimony or other witness statements for use by defense counsel in connection with a pre-trial hearing. These questions are interesting, but we sit to review judgments affecting substantial rights, not to investigate legal issues for their own sake.

10. Defendant pleaded guilty in 1976 in the United States District Court for the Western District of Missouri to a two-count indictment for knowingly possessing an unregistered firearm and knowingly and unlawfully concealing explosive materials.

and who receives, possesses, or transports in commerce, after the date of enactment of this Act, any firearm shall be fined not more than $10,000 or imprisoned for not more than two years, or both.

One essential element of the offense charged in Count II is that Bruton must have been a convicted felon at the time he received or was in possession of a firearm. Defendant's complaint goes to the method of proof used by the government. He contends, first, that the government should have been forced to accept his offer to stipulate that he had been previously convicted of a felony in lieu of telling the jury what the felonies were. His second argument is that the government should have been limited to proof of one felony only.

The jury was exposed to defendant's prior convictions four times. The indictment was read to the jury panel during voir dire and again repeated in the jury instructions.[11] In its case in chief the government introduced into evidence the Judgment and Commitment Order from the Western District of Missouri and the arrest warrant, which also recited the two previous felonies.[12]

■ This Court has previously held that in a Section 1202(a)(1) case the government is not required to accept a defendant's stipulation to a prior felony conviction in lieu of proof of that element of its case. *United States v. Smith*, 520 F.2d 544 (8th Cir. 1975), *cert. denied*, 429 U.S. 925, 97 S.Ct. 328, 50 L.Ed.2d 294 (1976). See also *United States v. Brickey*, 426 F.2d 680, 686 (8th Cir.), *cert. denied*, 400 U.S. 828, 91 S.Ct. 55, 27 L.Ed.2d 57 (1970), and cases cited therein. We have also held on facts similar to the present case that it was not error to allow the government to prove two felony convictions when proof of only one was required. *United States v. Smith, supra*, 520 F.2d at 548; *United States v. Matthews*, 453 F.2d 1237 (8th Cir. 1972). *Contra, United States v. Romero*, 603 F.2d 640 (7th Cir. 1979).

■ While we acknowledged in *United States v. Smith, supra*, that a case might be imagined where proof of a plurality of convictions would be prejudicial, we do not think that is the case here. The defendant testified in his own behalf and admitted to the felony convictions on direct examination. The two convictions were not separate in time, were the result of one trial, and resulted in one prison term. We do not think defendant was prejudiced by the jury's knowledge that his previous federal conviction was on a two-count indictment rather than a one-count indictment, which is what he wanted the jury to be told. We adhere to the prevailing view in this Circuit that the government is not ordinarily limited to the proof of only one felony conviction when proof of a previous conviction is an element of its case.

V. Introduction Of The Arrest Warrant Into Evidence

■ The defendant contends that the introduction of an arrest warrant issued by the United States Parole Commission over his offered stipulation was error. Defendant argues that the government's only purpose in introducing the warrant was to place irrelevant and incompetent material before the jury. The warrant stated that defendant was wanted for violation of his parole in the Western District of Missouri. It also set out his two previous felony convictions. The United States argues that there were two valid reasons for introducing the warrant. First, the government had to prove as an element of its charge of

---

11. Count II of the indictment reads:

On or about the 14th day of December, 1979, in the Western District of Arkansas, Fort Smith Division, GEORGE ALVIN BRUTON, having been convicted on the 13th day of June, 1975, by the United States District Court for the Western District of Missouri of Possession of Unregistered Firearm [sic] and Concealing and Storing Explosives, a felony,

did knowingly possess firearms that had been transported in interstate commerce, to wit: [list of firearms]
in violation of 18 U.S.C. (Appendix) 1202(a)(1).

12. Defendant also challenges the introduction of the arrest warrant during the government's case. That issue will be discussed separately below.

assaulting a federal officer that Agent Cotterman was performing some official F.B.I. function at the time he was assaulted. Second, the government had the burden of proving that the defendant had not acted in self-defense at the time of his arrest. Defendant had informed the government of his intention to assert the defense of self-defense. As the government points out, the warrant was relevant to show defendant's knowledge of his parole-violator status, from which the jury could reasonably draw the inference that he knew a warrant for his arrest would be issued and that F.B.I. agents would be looking for him. The principle of *United States v. Smith, supra,* controls this issue. One party is generally not required to accept the other's offer to stipulate to an element of its case. Rulings on the prejudicial effect of otherwise admissible evidence are left to the sound discretion of the trial judge. We find no error in this evidentiary ruling.

### VI. Failure To Strike Twelve Prospective Jurors

█ Defendant contends that the trial court erred in refusing to grant his motion to dismiss twelve prospective jurors for cause. After the court voir dired the jury panel, both defense counsel and the Assistant United States Attorney were allowed to voir dire the panel. In response to defense counsel's question, twelve jurors answered affirmatively that they had heard or read something about Bruton's capture when it occurred. The court then granted defense counsel's request to voir dire those twelve prospective jurors individually and apart from the other panel members. On questioning by both defense counsel and the government's counsel, all twelve stated that they could cloak the defendant with the presumption of innocence, that they would base their verdict solely upon the facts and evidence presented at trial, that they would require the government to prove its case beyond a reasonable doubt, and that they

could give defendant a fair and impartial trial. None of the twelve remembered many specific details of the arrest. Those who did remember something about the incident stated that they had formed no opinion of the defendant based upon what they had heard or read. Three of the twelve were selected to hear the case.

█ Bruton has a fundamental right to trial by a fair and impartial jury. The circumstances surrounding this case, however, do not come close to a showing of prejudice or outside influence which would require reversal. Bruton does not argue that any of the jurors were in fact prejudiced against him. Unless actual bias is shown, the court's refusal to strike potential jurors will usually not be a basis for reversal. *United States v. Brown,* 540 F.2d 364, 379 (8th Cir. 1976). The argument is that twelve of the panel should have been dismissed for cause simply because they had read or heard about the arrest when it occurred nine months before. It is not necessary that jurors be totally ignorant of the facts and issues involved. *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). With our present methods of communication, it is unlikely that "any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case." *Id.* at 722–23, 81 S.Ct. at 1642. The test is whether the juror "can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Murphy v. Florida,* 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975).

Our independent evaluation of the voir dire testimony of the jury panel convinces us that no error was committed by the trial court in refusing to dismiss the twelve prospective jurors who had some knowledge of the case in light of their extensive testimony that each of them could give the defendant a fair trial, if chosen to serve.[13]

---

**13.** Defendant also alleges error in the court's failure to disqualify juror number six during the trial. Defense counsel twice told the court, in chambers, that he thought juror number six

was sleeping and not paying attention. At the second request, the court stated that it had been observing the juror closely and did not

## VII. The Handling of Jencks Act Statements at Trial

Defendant next contends that errors were committed at trial in connection with the use of Jencks Act materials. Bruton claims that it was reversible error for the trial court to mention Jencks Act material in the presence of the jury. During the trial, the court asked the United States Attorney to pass Jencks Act material to defense counsel each time a government witness concluded his direct testimony. These requests were made in the hearing of the jury. Defendant objected each time to the jury's being made aware of Jencks Act procedures. At one point, the trial court explained to the jury what Jencks Act statements are. Defendant again objected. Defendant relies on *United States v. Gardin*, 382 F.2d 601 (2nd Cir. 1967), which criticizes Jencks Act production procedures in the jury's presence. *Gardin* states that the production of Jencks Act materials should take place out of the jury's presence. *Gardin* does not hold, however, that production of such materials in the jury's presence is *per se* reversible error. *Id.* at 605.

■ We agree with the Second Circuit's suggestion that, if defendant so requests, Jencks Act materials should be handed over outside the jury's presence. Bruton here argues that the jury may infer that a government witness's statement is a prior consistent statement when they see that it is produced, if it is not then used by the defense. Admittedly there is a chance of such a conclusion's being drawn if the jury's attention is called to the written statements. After reviewing the transcript of Bruton's trial, however, we hold that there is no basis for such an argument in this case. Defense counsel vigorously cross-examined each government witness. While examining Agent Cotterman, the agent

who wounded Bruton, defense counsel effectively used Cotterman's 302 Report and his grand-jury testimony to put at issue the important question of whether and when Bruton fired a shot at Cotterman. While handling Jencks materials outside the jury's presence is the better practice, we do not think that prejudicial error was committed here.

Defendant also alleges as error the court's denial of his motion to produce Agent Jim Freeman's Standard Form Number 418, commonly called a "shooting report." Shooting reports are routinely made by F.B.I. agents whenever a firearm is fired during an arrest, and these reports are sent to F.B.I. headquarters in Washington, D.C. Agent Freeman had prepared two reports for his agency. One was the 302 Report for use by the United States Attorney (302 is the number of a government form), which had already been supplied to defense counsel. Apparently the United States Attorney in Fort Smith did not then have a copy of the shooting report. When defense counsel moved for production of the shooting report or a hearing on the issue outside the jury's presence, the motion was denied without comment.

■ Agent Freeman's shooting report is a statement for purposes of the Jencks Act and should have been produced on the defendant's motion pursuant to 18 U.S.C. § 3500(b).[14] On the facts of this case, however, the failure to produce this particular report was harmless error. At the oral argument of this case, we asked government counsel to supply us a copy of the shooting report, and he has done so. The report contains only the barest statement of the circumstances surrounding the exchange of gunfire between Agent Cotterman and Defendant Bruton. There are no

---

think she was sleepy. There is no warrant in the record for disagreeing with this ruling.

**14.** 18 U.S.C. § 3500(b) reads:

(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness

in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

inconsistencies between Agent Freeman's and Agent Cotterman's testimony and the shooting report.[15] The shooting report would have added nothing to counsel's cross-examination of Agent Freeman.

### VIII. The 9mm Shell Casing Inventory

■ Defendant's final allegation of error concerns the government's failure to produce an inventory sheet for a 9mm shell casing prior to trial.[16] The shell casing, which was found on the ground outside defendant's car after he was wounded, was introduced at trial without objection from defendant. Later, after discovering that an inventory sheet existed for the shell casing, defendant moved for a mistrial. He also alleges that the court erred in failing to grant him a continuance at the hearing on his motion for a new trial when three government employees did not appear pursuant to his subpoenas. His new-trial motion was principally based on the government's failure to produce the inventory sheet. Defendant's argument is without merit. The shell casing was indisputably relevant and was received without objection. The existence of a separate piece of paper listing the shell casing as having been recovered by the government is of no substantial importance.

After review of the entire record and consideration of each of defendant's contentions, we hold that no error occurred affecting substantial rights. The judgment is affirmed.

LAY, Chief Judge, concurring and dissenting.

I respectfully dissent from Part II of the majority opinion dealing with the motion to suppress evidence discovered in a warrantless search of Bruton's mobile home. I otherwise concur in the opinion.

The majority's analysis defies basic fourth amendment principles protecting against unreasonable searches of the home.

First, it is fundamental that "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed...." *United States v. United States District Court*, 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972).

Second, a warrantless search of a house can be justified as incident to a lawful arrest only if it is confined to the area within the arrestee's reach. *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

Third, a warrantless contemporaneous search of a home *cannot* be justified even where a valid arrest has been made of the resident in the vicinity of the house; this is true even if there is probable cause to believe contraband is in the house. *Vale v. Louisiana*, 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970); *James v. Louisiana*, 382 U.S. 36, 86 S.Ct. 151, 15 L.Ed.2d 30 (1965).

Fourth, last term, the Supreme Court held a warrantless and nonconsensual entry *cannot* be made into a suspect's home in order to make a routine felony arrest. *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980).

Fifth, last week the Supreme Court emphasized the importance of the right of privacy of the home in holding that a law enforcement officer may not legally search for the subject of an arrest warrant in the

---

**15.** The shooting report contains the following information: the date of the incident, the weather conditions, the type of firearms involved, the number of shots fired, the position of the agent and subject, the distance the shots were fired from, and the injuries which resulted.

**16.** On his Fed.R.Crim.P. 16 motion defendant was furnished a copy of an F.B.I. ballistics report on a 9mm shell casing showing that the shell was fired from his 9mm Browning automatic. He was also furnished a list of all items seized from his person, his mobile home, and his vehicle. The government contends that the separate inventory sheet showing that the 9mm shell casing was recovered from the scene of the crime was not discoverable because it is an internal government document discoverable only after the witness who had prepared it had testified on direct examination. Whether that is true or not, the defendant had ample notice from the ballistics report that the government had possession of the shell casing.

home of a third party without first obtaining a search warrant. *Steagald v. United States,* —— U.S. ——, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981).

The majority's holding does violence to these principles and simply adds confusion to the otherwise distinct line between legal and illegal searches of the home. The majority justifies a warrantless "sweep search" as an exigent circumstance, thus avoiding the warrant requirement of the fourth amendment. Under the circumstances existing here this exception is untenable and erodes the basic protections just recited. Under this reasoning the exception engulfs the rule in almost any arrest situation.

We should keep in mind the Government bears the burden of proving that the facts support an exception to the warrant requirement, and the reasonableness of the officers' belief that an exceptional situation exists is to be reviewed under an objective standard. *See Root v. Gauper,* 438 F.2d 361, 364 (8th Cir. 1971). The courts have given close examination to claims that fear of accomplices justified searches of this sort. For example, in *United States v. Dien,* 609 F.2d 1038, 1046–47 (2d Cir. 1979), *aff'd on rehearing,* 615 F.2d 10 (2d Cir. 1980), the agents had information that the suspect had accomplices. However, when agents were at the scene, they saw no other persons. Furthermore, the agents did not conduct an immediate search "as would normally be expected if one suspected hidden accomplices." *Id.* at 1047. The court concluded, therefore, that "[t]here is no basis for finding exigent circumstances since the agents had no grounds for believing, nor did their conduct indicate that they in fact believed, that there were any other persons in the studio." *Id. See also United States v. Carter,* 522 F.2d 666, 674–76 (D.C.Cir.1975) (no information about whereabouts of accomplices; no movements observed); *United States v. Basurto,* 497 F.2d 781, 787–91 (9th Cir. 1974) (defendant was armed in a prior incident, and when arrested turned toward house and yelled "it's the police"; insufficient to justify search); *United States v. Cooks,* 493 F.2d 668, 672 (7th Cir.

1974), *cert. denied,* 420 U.S. 996, 95 S.Ct. 1437, 43 L.Ed.2d 679 (1975) (presence of two men with guns and "mere possibility" of others insufficient); *United States v. Gamble,* 473 F.2d 1274, 1276–77 (7th Cir. 1973) (information that defendant possessed firearm and "rustling noises" inside house insufficient). *Cf. Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

In the present case, the Government brings forth pitifully little evidence to support its claim that the officers reasonably feared that an armed accomplice was inside the trailer. No one saw any sign of another person. In fact, the officers saw Bruton lock the door of the trailer from the outside with a padlock. Further, the officers' behavior at the scene is inconsistent with this claim. There was testimony that the search of the mobile home did not begin until several minutes after Bruton's capture, and that in the meantime and afterwards a group of agents stood around outside the mobile home's windows. If the officers actually feared an attack one would expect them to seek positions of safety. It defies common sense that an agent of the F.B.I. would crawl through a small window space in a mobile home in sincere anticipation that a dangerous gunman was hiding inside. The instincts of self-preservation of any reasonable person would dictate otherwise, let alone the sensitive and careful judgment of a trained law enforcement officer. Finally, there was uncontradicted testimony that an agent told Bruton after the shooting that "we've got your partner across town", indicating an awareness that the accomplice was not then in Bruton's mobile home.

I know of no decision which has gone this far. This is not a situation where the home was used as an armed fortress in a shootout with the police. Clearly under these circumstances the police would have a right to secure the premises. *See United States v. Young,* 553 F.2d 1132 (8th Cir.), *cert. denied,* 431 U.S. 959, 97 S.Ct. 2686, 53 L.Ed.2d 278 (1977). Nor is this a factual situation where the police make an arrest *within* the premises and "fan out" to make

certain no other accomplices are inside who might provide a danger or hindrance to an effective arrest. *See United States v. Briddle*, 436 F.2d 4, 7 (8th Cir. 1970), *cert. denied*, 401 U.S. 921, 91 S.Ct. 910, 27 L.Ed.2d 824 (1971). Nor is this a case of "hot pursuit" where the officers follow a suspected armed felon into a house that he had entered minutes before. *See Warden v. Hayden*, 387 U.S. 294, 299, 87 S.Ct. 1642, 1646, 18 L.Ed.2d 782 (1967).

Finally, the claim by the law enforcement agents that they did not have time to obtain a search warrant is not relevant here. As the Supreme Court points out in *Steagald*, "[I]f a magistrate is not nearby, a telephonic search warrant can usually be obtained. See Fed.R.Crim.Proc. 41(c)(1), (2)." —— U.S. at ——, 101 S.Ct. at 1652. The irony of today's holding is that under *Steagald*, officers with a warrant for Prince's arrest could not conduct a warrantless search of Bruton's home. They could, however, conduct the same warrantless search simply by asserting a belief that Prince was a dangerous accomplice who might be lurking in Bruton's home.

I would reverse Bruton's conviction for possession of firearms and remand for a new trial in which the firearms obtained in the search of the mobile home were suppressed.