UNITED STATES of America, Appellee,

v.

**Ronnie BLADE, Appellant.**

**No. 86–1411.**

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 14, 1986.

Decided Feb. 11, 1987.

Rehearing and Rehearing En Banc
Denied April 8, 1987.*

---

* Heaney, McMillian and Arnold, Circuit Judges would have granted rehearing en banc.

Mark S. Packer, St. Louis, Mo., for appellant.

Richard L. Poehling, Asst. U.S. Atty., St. Louis, Mo., for appellee.

Before JOHN R. GIBSON, FAGG and MAGILL, Circuit Judges.

JOHN R. GIBSON, Circuit Judge.

Ronnie Blade appeals from the district court's[1] final judgment following a jury verdict finding him guilty of possessing a firearm as a convicted felon in violation of 18 U.S.C. App. § 1202(a)(1) (1982). Blade also appeals from the court's order finding him to be a dangerous special offender under 18 U.S.C. § 3575 (1982) and sentencing him to a term of nine years imprisonment. Blade argues first that his conviction under section 1202(a)(1) should be reversed because the trial court erred in excluding expert testimony on the accuracy of eyewitness identification and in permitting the government to present evidence of four prior convictions similar in nature to the offense charged. Blade further argues that the district court's determinations under the Dangerous Special Offender Act should be reversed because the court erred in concluding that future conduct is immaterial to a finding that Blade is a dangerous special offender, in denying Blade's request to have a psychiatric expert witness appointed to testify as to Blade's propensity to commit crime, and in relying upon unverifiable hearsay in reaching its conclusion. Blade also urges that, at a minimum, his nine-year sentence should be vacated, as it is not reasonably related to the two-year maximum sentence for the underlying felony conviction. We affirm the judgment of the district court.

The first trial in this case ended in a mistrial when the jury was unable to reach a unanimous verdict; this appeal follows the second trial. The charge against Blade for possession of a firearm arose from an August 13, 1984 pre-dawn police pursuit in St. Louis of an automobile during which the driver of the car dropped a firearm to the street. At the time this event occurred, Blade, his wife, and his step-son, were residing in Chicago and had travelled to St. Louis for the weekend. Blade spent Friday night with his sister, Francine. On Saturday, Francine and her friend, Beverly Tate, used Tate's new red Datsun 280zx, which was later identified as the car involved in the August 13 pursuit, to move Francine out of the apartment. Francine testified that during the move they placed Blade's brown attache case, containing his wallet and his parole travel permit in the car; they never retrieved these items.

Officer Olish, a St. Louis City police officer, was on patrol at approximately 3:45 a.m. on Monday, August 13, 1984, when he observed a red sports car being operated with no license plates. Olish stopped the car, directed his flashlight on the driver, and asked him twice for his license. The driver, who looked straight ahead and did not speak, drove off. Olish estimated that he had fifteen to thirty seconds in which to view the driver. Olish then pursued the car and radioed his pursuit to the police dispatcher. Olish never broadcasted a description of the driver.

Olish was joined in the pursuit by other officers. During the chase, the driver dropped an object to the ground and Olish drove past it, continuing the pursuit. When Olish realized that one of his tires was losing air, he dropped out of the pursuit and retrieved the object, a handgun. Olish never broadcasted that he believed a gun had been dropped or that one had been found.

Officer Thompson, who had joined the pursuit, attempted to block the path of the sports car with his police car. He directed an aircraft landing light at the driver in an effort to blind him. The car, however, was able to pass the officer's roadblock. Thompson testified that in order to pass the roadblock, the driver had to slow down to ten miles per hour and pass within a foot and a half of him. Thompson testified that he had about ten seconds in which to view the driver, and, in court, he identified the driver as the defendant, Ronnie Blade.

1. The Honorable Stephen N. Limbaugh, United States District Court for the Eastern District of Missouri.

Officer Roy White, who had also become involved in the pursuit, testified that he followed the sports car until it stopped. White testified that he stopped his car about fifteen to twenty feet from the suspect's automobile and observed the driver and passenger for about twenty seconds, whereupon they ran from the sports car and fled through a gangway. White stayed at the scene and radioed the direction of their flight to the dispatcher. When the dispatcher asked for a clothing description, White answered that "[o]ne is wearing a yellow jacket." No other description of the car's occupants was broadcasted by any of the officers involved in the pursuit.

Officer Mike Fears canvassed the area of flight and found a white jacket containing a wallet with Blade's driver's license and a gray jacket containing Blade's wife's Illinois identification card. Officer Olish went to the radioed location of the abandoned car. In searching the interior of the car, he found Ronnie Blade's State of Illinois Parole Travel Permit.

Officer Fears testified that he first showed Blade's driver's license to Officer Olish at the station house when Olish was filling out the police report. Olish testified that he used Blade's driver's license to fill out the description of the driver for his police report. Olish also testified that the driver had a short afro hair style, which was the style of Blade's hair on his driver's license picture. However, Blade's witnesses uniformly testified that Blade had a chemically processed jerry curl at the time of his trip to St. Louis.

The driver's license was the only picture of possible suspects shown to Officers Olish, Thompson and White. On October 15, 1984, approximately two months after the pursuit, Olish was called to a line-up that he knew involved Ronnie Blade. At the line-up he identified Blade as the driver of the sports car. The government presented no fingerprint evidence at trial linking Blade to either the car or the handgun.

## I.

### A.

Blade contends that, because the central issue in the case was the police officers' identification of him as the driver of the sports car, the court erred in excluding the expert testimony of Dr. Howard Timm, a forensic psychologist in the field of eyewitness identification. Blade states that Dr. Timm would have testified about the three-stage process involved in eyewitness identification,[2] the psychological factors which prevent a witness from making an accurate identification, and research showing that police officers have no greater accuracy than laypersons in making identifications. In the first trial Dr. Timm had been permitted to testify. However, in the second trial, after reading Dr. Timm's testimony in the first trial and receiving an offer of proof describing additional matters as to which he would testify, the court granted the government's motion in limine to exclude Dr. Timm's testimony.

In excluding the expert testimony, the court referred to our analysis in *Purham v. United States*, 725 F.2d 450 (8th Cir. 1984). In *Purham*, we held that the district court acted within its discretion in denying an indigent defendant's request for the services of a criminologist to testify on the inherent inaccuracies of eyewitness identification. *Id.* at 454. We stated that the expert witness would not have assisted the jury in evaluating the witness' perception and identification, and admitting the testimony might have resulted in unfair prejudice because "the aura of reliability and trustworthiness that surrounds scientific evidence outweighed any small aid the expert testimony might have provided." *Id.* (citing *United States v. Fosher*, 590 F.2d 381, 383 (1st Cir.1979)).

After allowing defense counsel to make an elaborate offer of proof as to the nature of Dr. Timm's testimony, the district court opined that any deficiencies in the police

---

2. The three stages are acquisition (initial perception of the event), retention (time between the event and the eventual recollection), and retrieval (the recall of stored information).

officers' identification of Blade as the driver of the car could be more suitably addressed during cross-examination in which defense counsel could bring out the relevant circumstances, such as the amount of time to observe and the available lighting, that might effect the witness' ability to make an accurate identification. The court also considered the abstract, general nature of Dr. Timm's proffered testimony, that Dr. Timm had not had any contact with the witnesses or with Blade, and that his only knowledge of the events came from reading the police report and from discussing the case with defense counsel. The court ultimately concluded that the probative value of Dr. Timm's expert testimony was substantially outweighed by the danger that the jury would attach too much weight to it because of its aura of special reliability. *See* Fed.R.Evid. 403.

■ The exclusion of expert testimony is a matter within the sound judicial discretion of the trial judge, and we will reverse only if his decision was manifestly erroneous. *United States v. Oliver*, 525 F.2d 731, 737 (8th Cir.1975), *cert. denied*, 424 U.S. 973, 96 S.Ct. 1477, 47 L.Ed.2d 743 (1976). To support his contention that the district court erred in exercising its discretion, Blade points to several recent cases where other appellate courts have discussed in detail the reasons for admitting expert eyewitness identification testimony under Fed.R.Evid. 702. *See United States v. Moore*, 786 F.2d 1308, 1312 (5th Cir. 1986); *United States v. Sebetich*, 776 F.2d 412, 419 (3d Cir.1985); *United States v. Downing*, 753 F.2d 1224, 1229–32 (3d Cir. 1985); *United States v. Smith*, 736 F.2d 1103, 1107 (6th Cir.), *cert. denied*, 469 U.S. 868, 105 S.Ct. 213, 83 L.Ed.2d 143 (1984). These courts noted the dangers of misidentification in criminal cases, the increasing acceptance of eyewitness identification evi-

dence in the scientific community in recent years, and its possible helpfulness to a jury in explaining counter-intuitive factors that may not be fully developed through cross-examination. The crux of these decisions, however, is simply that such expert testimony comes within the scope of Fed.R. Evid. 702, and, thus, should not be excluded automatically. Nonetheless, each court invariably held that the district court has broad discretion in, first, determining the reliability of the particular testimony and, second, balancing its probative value against its prejudicial effect.[3] As we have already observed, the district court did not automatically exclude Dr. Timm's testimony. Defense counsel fully explained the nature and purpose of the testimony to the trial court, and the record shows that the court carefully considered those reasons before excluding the testimony.

■ In addition, we would be especially hesitant to find an abuse of discretion unless the government's case against the defendant rested exclusively on uncorroborated eyewitness testimony. *Cf. Moore*, 786 F.2d at 1313; *Sebetich*, 776 F.2d at 419; *Downing*, 753 F.2d at 1243. Here, there was other evidence linking Blade to the scene of the incident. Blade's identification was found not only in the automobile, but also in the jacket found in the area of the driver's flight from the sportscar. In light of the nature of Dr. Timm's testimony, the district court's appraisal of its impact on the jury, and the additional evidence placing Blade at the scene, we cannot say that the district court abused its discretion in excluding the expert testimony.

## B.

Blade argues that the district court erred in permitting the government to present evidence of his conviction for four similar felonies notwithstanding his offer to stipu-

---

3. Furthermore, in none of these cases was the trial court found to have abused its discretion in excluding the expert's testimony. In two cases, *Sebetich* and *Downing*, the Third Circuit remanded the case because the trial court had automatically excluded the evidence as not meeting the test for admissibility contained in

Fed.R.Evid. 702. The trial courts were instructed to exercise their discretion by balancing the value of the testimony against the danger of confusing or misleading the jury. *See Sebetich*, 776 F.2d at 419–20; *Downing*, 753 F.2d at 1242–43.

late to a prior conviction. This contention is meritless.

18 U.S.C. App. § 1202(a)(1) provides that any person who is convicted of a felony and who receives, possesses, or transports a firearm shall be fined or imprisoned. Thus, it is essential to the prosecution's case to establish that Blade was a convicted felon at the time he possessed the handgun. Immediately prior to trial, Blade sought to stipulate that he was a convicted felon. The government refused this offer. Blade then requested that the court limit the government to proving only one prior conviction. The district court ruled that, although the government need not accept Blade's stipulation, it could not introduce evidence of more than four of Blade's thirteen prior felony convictions. The government presented this evidence through the testimony of one witness who simply listed the date, jurisdiction, and type of offense for each of the four convictions.

■ We have repeatedly held that in a section 1202(a)(1) case, the government is not required to accept a defendant's stipulation to a prior felony conviction in lieu of proof of that conviction. *E.g., Rush v. United States,* 795 F.2d 638, 639–40 (8th Cir.1986); *United States v. Flenoid,* 718 F.2d 867 (8th Cir.1983). We have also held that it is not error to allow the government to prove more than one conviction, although proof of but a single conviction is required. *Rush,* 795 F.2d at 639; *see also Flenoid,* 718 F.2d at 868; *United States v. Bruton,* 647 F.2d 818, 825 (8th Cir.); *cert. denied,* 454 U.S. 868, 102 S.Ct. 333, 70 L.Ed.2d 170 (1981). In light of these decisions and the non-prejudicial manner in which the evidence was presented, we conclude that there was no abuse of discretion by the district court.

## II.

We next address Blade's contention that his enhanced sentence, entered pursuant to the Dangerous Special Offender Act, 18 U.S.C. § 3575, should be vacated or modified. Prior to Blade's first trial, the government filed a notice of intent to proceed under the Dangerous Special Offender Act. After the guilty verdict was returned, the trial court was made aware of the notice and held a hearing on the matter.

■ The Dangerous Special Offender Act requires the judge to make two findings as a predicate to imposing an increased sentence: first, that the defendant is a "special offender" in that he had been convicted of two or more felonies within a specified time period, and, second, that the defendant is a "dangerous offender" and a longer period of confinement is necessary to protect the public from further criminal conduct. *See* 18 U.S.C. § 3575(e); *see also United States v. Ilacqua,* 562 F.2d 399, 402–03 (6th Cir.1977), *cert. denied,* 435 U.S. 906, 98 S.Ct. 1453, 55 L.Ed.2d 497 (1978).

### A.

Blade moved to retain a psychiatrist under 18 U.S.C. § 3006A(e)(1) to testify at the hearing as to Blade's lack of dangerousness. The district court denied Blade's motion. Blade argues here, as he did at the hearing, that a psychiatrist could have testified as to how the positive steps that Blade has taken while in prison and on parole affected his prospective danger to the public.[4] Blade contends that the court denied his request on the erroneous ground that assessment of Blade's future conduct was immaterial in making the required finding of dangerousness. Blade points to the following language in the district court's order to establish error:

> Defendant apparently interprets the special dangerous offender act as prospective, thereby concluding that evidence should be admissible to determine his propensity for the commission of a crime

---

**4.** Blade states that he has taken a number of positive steps during his imprisonment and parole: he received a high school equivalency degree, took college courses, became certified in several trades, moved away from St. Louis, married, participated in an ex-offender program, and found employment.

in the future. This is not the test. The determination by the Court as to whether or not the defendant is dangerous to society is to be made on the basis of his past criminal conduct and not his projected future conduct. *U.S. v. Schell,* 692 F.2d 672 (10th Cir.1982), *U.S. v. Neary,* 552 F.2d 1184 (7th Cir.) *cert. denied,* 434 U.S. 864, 98 S.Ct. 197, 54 L.E.2d 139 (1977).

*United States v. Blade,* No. 85–83 CR(5) (E.D.Mo. Dec. 6, 1985) (order denying defendant's motion to retain expert witness). Blade argues that this shows that the judge had an improper view of the law in both denying him psychiatric testimony and in the ultimate determination that Blade was a "dangerous offender." He further contends that the judge's interpretation of section 3575 effectively eliminates its dangerousness requirement and turns section 3575 into a mere recidivist statute. We reject this argument.

The judge clearly understood that he was required to make a special finding of dangerousness. In the order issued after the dangerous special offender hearing, the judge detailed not only his findings concerning Blade's prior convictions for violent felonies and his consideration of the jury's guilty verdict in the present case, but also Blade's reputation for violence and the character testimony given by Blade's relatives and parole agent. *See United States v. Blade,* No. 85–83 CR(5) (E.D.Mo. Mar. 6, 1986) (order finding defendant to be Dangerous Special Offender). Thus, the judge did not make his decision solely in reliance on Blade's prior convictions.

■ Of course, the determination as to whether a particular special offender will pose a danger to society involves some prediction as to whether he will engage in criminal conduct in the future. However, we believe the district judge in fact made such a prediction of future conduct when he examined both the "fact and the nature" of Blade's prior convictions, together with other evidence of Blade's character and prior conduct. *United States v. Schell,* 692 F.2d 672, 675 (10th Cir.1982) (citing *United*

*States v. Warme,* 572 F.2d 57, 62 (2d Cir.), *cert. denied,* 435 U.S. 1011, 98 S.Ct. 1885, 56 L.Ed.2d 393 (1978)). When placed in the context of the record as a whole, the statement cited by Blade does not show that the district court had an erroneous view of the necessary finding of dangerousness. Thus, we conclude that the court used the appropriate standard in finding Blade to be a dangerous special offender.

■ We now consider whether the judge's denial of the defendant's request to retain a psychiatrist was an abuse of discretion. The district court is generally in the best position to decide, within its sound discretion, whether the proferred testimony is necessary for an adequate defense. *See United States v. Purham, supra.* In support of his application, Blade simply stated that psychiatric evaluation and expert testimony were necessary to show his "present character, state of mind and disposition," and his brief states only that the testimony would have "establish[ed] the proper context" for the recent developments in his life. Appellant's Brief at 42. The judge, however, determined that he could be fully informed as to Blade's dangerousness, or lack thereof, by examining his criminal history and by considering the character and reputation evidence presented by Blade and the government. Blade was perfectly able to, and did, present evidence relating to his progress since his earlier convictions. The district court did not abuse his discretion in concluding that psychiatric expert testimony was unnecessary.

**B.**

Blade next contends that, at the sentencing hearing, the district judge improperly considered the unverifiable hearsay testimony of two police officers. Officers Burgoon and Banaszek testified about their prior investigation of the circumstances surrounding the shooting of a Mr. Odell Portwood. They each testified that they had interviewed Mr. Portwood, and that Mr. Portwood had identified Blade as his assailant. However, there was no prosecution in that case because the witnesses

refused to testify out of fear that Blade would kill them. In addition, Officer Burgoon testified as to several other homicide investigations in which he was not personally involved. In these instances, he relied on police reports made by other investigators. These reports contained statements of identified victims who claim that Blade shot or assaulted them. Officer Banaszek's only knowledge of Blade's reputation came from his interview of Odell Portwood and information from unidentified sources that "word on the street" in 1974 was that Blade had put a "contract" out on three men. Hearing Tr. at 22. Blade asserts that admitting this hearsay testimony into evidence violated his due process right of confrontation and cross-examination.

The court has broad discretion in the type of evidence it receives at a sentencing hearing:

> No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.

18 U.S.C. § 3577 (1982).

In enacting this provision, Congress referred to *Williams v. New York,* 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949), in which the Supreme Court held constitutional a New York statute giving broad discretion to a sentencing judge in the type of information he considers. The Court described the purpose of departing from the confines of the rules of evidence:

> A sentencing judge, however, is not confined to the narrow issue of guilt. His task within fixed statutory or constitutional limits is to determine the type and extent of punishment after the issue of guilt has been determined. Highly relevant—if not essential—to his selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics. And modern concepts individualizing punishment have made it all the more necessary that a sentencing judge

not be denied an opportunity to obtain pertinent information by a requirement of rigid adherence to restrictive rules of evidence properly applicable to the trial. *Id.* at 247, 69 S.Ct. at 1083 (footnote omitted).

Blade cites *Specht v. Patterson,* 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967), for the proposition that hearsay testimony is inadmissible at a sentencing hearing. In *Specht,* the Court examined the statutory sentencing procedure under Colorado's Sex Offenders Act. That Act was similar to the Special Dangerous Offenders Act in that it permitted a trial court to increase an otherwise maximum ten-year sentence to life imprisonment if the court determined that the person would "[constitute] a threat of bodily harm to members of the public, or is an habitual offender and mentally ill." *Id.* at 607, 87 S.Ct. at 1211 (quoting Colo. Rev.Stat.Ann. § 39–17–1 (1963)). The statute did not provide for a hearing, however, and the trial judge based his sentencing decision solely on the written report of a psychiatrist who had examined the defendant. The Court held that these procedures did not provide the defendant with adequate safeguards. *Id.* at 611, 87 S.Ct. at 1213. It concluded that due process required the defendant to be given an opportunity to be heard, including a hearing with defense counsel present and the right to be "confronted with witnesses against him, have the right to cross-examine, and to offer evidence of his own." *Id.* at 610, 87 S.Ct. at 1212.

Section 3575 provides for such a hearing, *see* 18 U.S.C. § 3575(b), and Blade was granted all of the procedural rights enumerated in *Specht.* The Court's decision in *Specht* does not mean that the trial court is strictly bound by the rules of evidence. The rationale of *Williams v. New York, supra,* still applies. We believe that due process is satisfied "[s]o long as the information which the sentencing judge considers has sufficient indicia of reliability to support its probable accuracy. *United States v. Marshall,* 519 F.Supp. 751 (E.D. Wisc.1981), *aff'd.* 719 F.2d 887 (7th Cir.

1982); *see also United States v. Williamson,* 567 F.2d 610 (4th Cir.1977). Thus, in order to prevail on his claim that his due process rights have been violated Blade must show that the challenged evidence is materially false or unreliable and that it served as the basis for his sentence. *See United States v. Reme,* 738 F.2d 1156, 1167 (11th Cir.1984), *cert. denied,* 471 U.S. 1104, 105 S.Ct. 2334, 85 L.Ed.2d 850 (1985); *United States v. Ching,* 682 F.2d 799, 801 (9th Cir.1982).

■ While the record shows that some of the officers' hearsay testimony did not contain "particularized guarantees of trustworthiness," *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980), and, therefore, should not have been considered by the court, it is clear that the district court did not use these statements as the basis for finding Blade to be a dangerous special offender. At the hearing, the court stated that hearsay evidence is admissible, but that it would be improper to "consider information from unknown sources or faceless sources, that is [sic] an unidentifiable source." Hearing Tr. at 5. Also, in its subsequent order, the court recognized that it could consider hearsay testimony only if the source could be tested for credibility. *United States v. Blade,* No. 85–83 CR(5), slip op. at 3 (E.D.Mo. Mar. 6, 1986). There is substantial support in the record for the court's assertion that it would not rely on this type of testimony. In outlining its reasons for finding Blade to be a dangerous special offender, the only specific incident mentioned by the court was the shooting of Odell Portwood [5]—an incident in which officers Burgoon and Banaszek both spoke directly with a declarant who is now unavailable. We believe this evidence was sufficiently reliable, and that there was no abuse of discretion in admitting it. The court's only other reference to the officers' testimony was the court's statement that "defendant has a reputation

of being a violent person known to carry arms and to use them and of being a major distributor of heroine." *Id.* at 3. However, this was only one of many factors in the court's decision, and it appears to us that in recognizing it as reputation testimony, the court realized its limited probative value. In light of all the circumstances, we cannot say that the unreliable hearsay testimony formed the basis of the district court's determination.

### C.

Finally, Blade argues that the nine-year sentence imposed was disproportionate to the two-year maximum sentence permitted under § 1202(a)(1). We find this contention meritless.

Blade challenges the court's determination by simply restating his earlier protests. He points to the "suspect nature of the government's evidence" at the trial on the section 1202(a)(1) violation, the "10-year old hearsay at the Section 3575 hearing," and Blade's "serious efforts to modify his life over the seven years in prison and thereafter while on parole." Appellant's Brief at 47. We have already determined, however, that there was no reversible error committed either at trial or at the sentencing hearing.

■ In his order, the district judge specifically recognized the proportionality requirement, which indicates that he considered this requirement in imposing sentence. We believe that the district court's reasons are sufficient to support its finding that Blade was a dangerous special offender and its imposition of a nine-year sentence. This sentence is comparable to sentences imposed for the same offense in other jurisdictions. *See United States v. Davis,* 710 F.2d 104, 109–10 (3d Cir.) (rejecting proportionality challenge to twelve-year sentence imposed pursuant to section 1202(a)(1) violation), *cert. denied,* 464 U.S.

---

5. Blade's brief makes much of the court's characterization of Blade as Odell Portwood's "assassin". Blade points out that Portwood, although deceased, did not die from the wounds inflicted in the incident allegedly involving Blade. This misses the point. Although the trial court may have been more careful in the terms it used, the incident is no less probative of Blade's dangerousness simply because his victim recovered.

1001, 104 S.Ct. 505, 78 L.Ed.2d 695 (1983); *United States v. Williamson,* 567 F.2d 610, 616 (4th Cir.1977) (rejecting proportionality challenge to eight-year sentence imposed pursuant to section 1202(a)(1) violation).

We affirm the judgment of the district court.