**UNITED STATES of America,
Appellee,**

v.

**William C. BRICKEY, Jr., Appellant.**

**No. 19714.**

United States Court of Appeals,
Eighth Circuit.

April 24, 1970.

Rehearing Denied May 25, 1970.

See also D.C., 296 F.Supp. 742.

---

Jack L. Lessenberry, Little Rock, Ark., for appellant.

Sidney H. McCollum and James G. Mixon, Asst. U. S. Attys., Little Rock, Ark., for appellee; W. H. Dillahunty, U. S. Atty., on the brief.

Before MATTHES, GIBSON and LAY, Circuit Judges.

GIBSON, Circuit Judge.

The defendant William C. Brickey, Jr., was indicted in the Eastern District of Arkansas on 24 counts of mail fraud in violation of 18 U.S.C. § 1341 and was convicted in a jury trial on two of the counts.[1] He was sentenced to a 4-year term of imprisonment. A timely appeal was filed in which Brickey raises a number of issues, including the selection of the grand jury, the sufficiency of the evidence, the applicability of the mail fraud statute and evidentiary issues, all of which will be discussed seriatim. We affirm the conviction.

The indictment charged that Brickey, while president and chairman of the board of the Republic Casualty Insurance Company (an Arkansas corporation), devised a scheme to defraud that company and its stockholders, policyholders and general creditors by falsely representing that the company was solvent and by diverting company funds to his personal use. A number of overt acts were listed in the indictment setting forth the fraud.

In addition to proving numerous misrepresentations by Brickey as to Republic's solvency, the record establishes that Brickey caused two separate checks to be sent through the mail in carrying out his scheme to divert funds of Republic to his personal benefit. One check for $75,000 was drawn upon Republic's account by Brickey and utilized by Brickey's agent and attorney to purchase a cashier's check from the Central National Bank of Chicago, Illinois, the check on Republic being sent through the mail to the Worthen Bank & Trust Company of Little Rock, Arkansas. The second check, which was for $35,000, was drawn on Republic by Brickey to repay a personal loan of Brickey's that he had secured for the purpose of completing payment on his personal purchase of the controlling stock of United Benefit Fire Insurance Company. This check was deposited by the drawee Leonhart & Company in the Mercantile Safe Deposit & Trust Company of Baltimore, Maryland, and was sent by mail for collection to the Worthen Bank & Trust Company of Little Rock, Arkansas.

The completion of the above two acts of issuing and causing to be cleared checks amounting to $110,000 on Republic's account completed an obvious fraud on Republic, its stockholders and policyholders. This is not denied by Brickey. He contends, however, that his acts amount only to common law fraud and that no federal violation has occurred.

SELECTION OF GRAND JURY

Brickey challenged the composition of the grand jury by filing a Motion to Dismiss the Indictment[2] on the ground that the key man system was used in compiling the grand jury list. He contends the key man system is per se unconstitutional or at least the use of the key man system

---

1. The remaining counts were dismissed prior to trial by the court on a pretrial motion filed by defendant.

2. The indictment was returned on September 11, 1968, approximately three and one-half months before the Jury Selection and Service Act of 1968 went into effect on December 23, 1968. 82 Stat. 54, 28 U.S.C. § 1863 (Supp. IV, 1969).

makes a prima facie case for an unconstitutional selection, thereby placing the burden on the Government of proving its use is constitutionally permissible.

The only proof submitted by Brickey in support of his contention was a newspaper list of the grand jurors' names, addresses and occupations and an unsupported affidavit which the trial court found to be false. No attempt was made to attack the entire jury list from which the particular grand jury was selected. The District Court after full hearing on the motion held that the defendant had produced no evidence of impropriety on the part of the officials concerned in the selections for the grand jury list and had not shown that the system failed to obtain a fair cross-section of the district.

■■■■ The Constitution requires jury selection systems to draw their jurors from a fair cross-section of the community. Thiel v. Southern Pacific Company, 328 U.S. 217, 220, 66 S.Ct. 984, 90 L.Ed. 1181 (1946). This does not mean that every class or subclass or identifiable group must be represented on every jury list but does mean there must not be any systematic, intentional or negligent exclusion of persons or groups. Hansen v. United States, 393 F.2d 763, 766–767 (8th Cir.), cert. denied, 393 U.S. 833, 89 S.Ct. 103, 21 L.Ed.2d 103 (1968); Bailey v. Henslee, 287 F.2d 936, 942 (8th Cir. 1961). The constitutional requirement of an impartial jury is met if there is no discrimination in the selection of names for the jury list. Many methods of jury selection have been used and approved by the courts where no intentional or systematic discrimination has been proved, and the burden of proving intentional and purposeful discrimination rests on the defendant. Hansen v. United States, 393 F.2d at 768; Turner v. Fouche, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970). The key man system is not improper per se. Pope v. United States, 372 F.2d 710, 723 (8th Cir. 1967), vacated on other grounds, 392 U.S. 651, 88 S.Ct. 2145, 20 L.Ed.2d 1317 (1968); Mobley v. United States, 379 F.2d 768, 773 (5th Cir. 1967); Sanders v. United States, 415 F.2d 621, 623 (5th Cir. 1969); United States v. DiTommaso, 405 F.2d 385, 390 (4th Cir. 1968), cert. denied, 394 U.S. 934, 89 S.Ct. 1209, 22 L.Ed.2d 465 (1969); United States v. Hoffa, 349 F.2d 20, 29–30 (6th Cir. 1965).

■■■■ We find that the District Court properly overruled the motion to dismiss as the defendant had not made out a prima facie case of intentional or negligent discrimination in the selection of the grand jury. No evidence was adduced and no showing was made with respect to the composition of the jury list from which the grand jurors were drawn and no showing was made that the officials selecting the jurors used improper standards or inadequate sources. No discrimination whatsoever has been shown in compiling the grand jury list. In addition, a scanning of the grand jury itself shows the jurors to be a representative cross-section of occupations from different social classifications residing in the district.

## SUFFICIENCY OF THE EVIDENCE

The elements of the offense of mail fraud under 18 U.S.C. § 1341 are "(1) a scheme to defraud, and (2) the mailing of a letter, etc., for the purpose of executing the scheme." Pereira v. United States, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954). In the instant case, Brickey concedes that the Government has established his scheme to defraud. However, Brickey does raise two contentions concerning the second element of the offense, the mailing. First, it is argued that Brickey neither mailed anything himself nor caused anything to be mailed with regard to the fraudulent transactions. Second, assuming *arguendo* that Brickey is deemed to have caused the mailing of the two checks by the Chicago and Baltimore banks to the Worthen Bank of Little Rock, Arkansas, Brickey contends the mail fraud statute is not applicable because these mailings were not "incident to an essential part of the scheme."

Raymond Shaheen was employed as an attorney by Brickey for the express pur-

pose of purchasing some 92,000 shares of stock (a controlling interest) in the United Benefit Fire Insurance Company of Omaha, Nebraska. Shaheen as attorney and agent for Brickey obtained from the Central National Bank of Chicago, Illinois, cashier's checks for $75,000 and $35,000, which were then used to purchase the stock of United Benefit for Brickey.

The $75,000 cashier's check was purchased with a $75,000 check drawn on Republic Casualty's account at the Worthen Bank of Little Rock, Arkansas, by Brickey and endorsed by Brickey and Shaheen. The $75,000 check drawn on Republic was sent through the mail for collection from the Chicago bank to the Worthen Bank of Little Rock and subsequently paid.

The $35,000 cashier's check was purchased by Shaheen with $35,000 loaned Brickey by Harold Leonhart & Company. At the time Brickey borrowed the money, he assigned an oil well as collateral and gave his personal note to Harold Leonhart & Company and drew a $35,000 check on the Republic Casualty account at the Worthen Bank of Little Rock payable to the order of Harold Leonhart & Company. Although Brickey's check was not postdated, Leonhart and Brickey apparently had a mutual understanding that Leonhart would not cash this check for approximately a month. Four weeks later Leonhart deposited Brickey's check for collection with the Mercantile Safe Deposit & Trust Company of Baltimore, Maryland, and it was in turn sent through the mail for collection to the Worthen Bank of Little Rock, Arkansas, which paid the check 21 days later.

■ Proof of the mailing of the two checks in question was furnished by Frank J. Descoteau, manager of the Proof and Transit Department of the Worthen Bank of Little Rock, who testified that the only way the checks signed by Brickey could have moved from the Central National Bank in Chicago to the Worthen Bank and from the Mercantile Bank in Baltimore to the Worthen Bank was through the mail. When it is the unvaried custom of a bank to use the mail for certain transactions, proof of this custom is sufficient to submit the question of mailing to the jury. United States v. Doran, 299 F.2d 511, 514 (7th Cir.), cert. denied, 370 U.S. 925, 82 S.Ct. 1563, 8 L.Ed.2d 504 (1962); Decker v. United States, 140 F.2d 378, 379 (4th Cir.), cert. denied, 321 U.S. 792, 64 S.Ct. 791, 88 L.Ed. 1082 (1944).

■ To establish the mailing element of the offense of mail fraud it is not necessary to show that the defendant mailed anything himself, it is sufficient to show that he caused the mailing. 18 U.S.C. § 2(b). "Where one does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended, then he 'causes' the mails to be used." Pereira v. United States, 347 U.S. at 8–9, 74 S.Ct. at 363.

■ Obviously, Brickey, acting through his attorney and agent Shaheen, caused the mailing of Brickey's $75,000 check drawn on Republic Casualty when he and Shaheen endorsed the check to the Central National Bank of Chicago for collection at the Worthen Bank of Little Rock. It is also clear that Brickey's $35,000 check was utilized to expedite collection of Leonhart's loan and was not given as collateral; therefore, Brickey can be deemed to have caused its mailing since he could reasonably foresee when he drew the check that use of the mail would follow in the ordinary course of the collection process as the drawee's locale was Baltimore, Maryland. We think the proof of mailing and the causing to be mailed of these two checks is more than adequate, and the evidence fully supports the verdict.

■ The Government used the testimony of Brickey's attorney Shaheen to show that Brickey caused the mailing of the $75,000 check and Brickey maintains this violated his attorney-client privilege. We recognize the confidential communication privilege of attorney and client,

Love v. United States, 386 F.2d 260, 265 (8th Cir. 1967), cert. denied, 390 U.S. 935, 88 S.Ct. 1111, 19 L.Ed.2d 1286 (1968), but no confidential communication was violated in this case. Acts or services done by an attorney for his client in the course of his employment do not come within the privilege because no private professional communication is entailed. Behrens v. Hironimus, 170 F.2d 627, 628 (4th Cir. 1948); United States v. Pape, 144 F.2d 778, 782 (2d Cir.), cert. denied, 323 U.S. 752, 65 S. Ct. 86, 89 L.Ed. 602 (1944); United States v. De Vasto, 52 F.2d 26, 30 (2d Cir.), cert. denied, 284 U.S. 678, 52 S. Ct. 138, 76 L.Ed. 573 (1931).

 Shaheen's testimony did not reveal any confidential information or advice derived from the professional relationship but simply the actual fact of his employment and the fact that he did certain acts in Brickey's behalf in purchasing the stock of United Benefit. This testimony was not within the ambit of the attorney-client privilege and was properly admitted by the trial court.

## APPLICABILITY OF THE MAIL FRAUD STATUTE, 18 U.S.C. § 1341

 Contrary to the contention of the defendant, the mailing of the checks in question was essential to the fraudulent scheme devised by Brickey to divert assets of Republic Casualty to his personal use. As stated by the Supreme Court in Pereira v. United States:

"Collecting the proceeds of the check was an essential part of that scheme. For this purpose, [the defendant] delivered the check drawn on a Los Angeles bank to the El Paso bank. There was substantial evidence to show that the check was mailed from Texas to California, in the ordinary course of business.

" * * * It is not necessary that the scheme contemplate the use of the mails as an essential element. United States v. Young, 232 U.S. 155, 34 S.Ct. 303, 58 L.Ed. 548. Here, the scheme to defraud is established, and the mailing of the check by the bank, incident to an essential part of the scheme, is established." 347 U.S. at 8, 74 S.Ct. at 362.

As previously discussed, each of these checks had to clear through the Worthen Bank of Little Rock in order for Brickey to successfully complete his fraudulent scheme, and the use of the mails was an essential act in processing the checks for clearing or collection.

The basic elements necessary to show a mail fraud violation of 18 U.S.C. § 1341 were proved in this case.

## ADMISSIBILITY OF EVIDENCE ON BRICKEY'S PERSONAL EXPENDITURES

Brickey utilized the General Leasing Corporation, which he wholly owned, to extract money from Republic Casualty, which monies were expended for Brickey's personal benefit. Brickey admitted that General Leasing was his company and concedes a diversion of Republic Casualty's funds but claims that evidence of the actual expenditures for his personal benefit was irrelevant and was offered for the sole purpose of inflaming the jury and creating prejudice against him.

The evidence showed that General Leasing paid for Brickey's purchase of a $9,500 diamond ring, a $4,250 swimming pool and for certain payments made on the purchase of Brickey's residence. The trial court admitted the evidence over objection, ruling that the Government was entitled to show that Republic Casualty's money was fraudulently diverted through General Leasing to Brickey in carrying out Brickey's scheme to defraud. The trial court cautioned the jury that it was no concern of the jury what Brickey bought with the money he expended for his personal use, and the evidence of these purchases should be considered only as "showing where Republic money went after it went to General Leasing Corporation, if it did go there."

Brickey relies heavily on Blumberg v. United States, 222 F.2d 496 (5th Cir.

1955), where the defendant charged with willful attempt to evade federal income taxes defended on the ground that the omissions in the reporting of his income were oversights. The court concluded that evidence of expenditures made by the defendant for an expensive wedding party for his daughter was irrelevant on the issue of whether the defendant's failure to report was intentional and the admission of this evidence was prejudicial in that, since no instruction was given, the jury was "bound to have thought that this money was additional income which had been concealed and not reported." *Id.* at 500.

■ *Blumberg* is not applicable to the testimony in the case at bar with regard to Brickey's personal expenditures for this evidence directly proved the fraudulent scheme to siphon off Republic funds through General Leasing to Brickey. The Government was not required to accept a judicial admission (assuming Brickey's stipulation would amount to a judicial admission) of the defendant but had a right to offer proof on the point admitted. United States v. Mishkin, 317 F.2d 634, 638 (2d Cir. 1963); Parr v. United States, 255 F.2d 86, 88 (5th Cir.), cert. denied, 358 U.S. 824, 79 S.Ct. 40, 3 L.Ed.2d 64 (1958). As stated in *Parr* at 88:

> "It is a general rule that 'A party is not required to accept a judicial admission of his adversary, but may insist on proving the fact.' 31 C.J.S. Evidence § 299, p. 1068. The reason for the rule is to permit a party 'to present to the jury a picture of the events relied upon. To substitute for such picture a naked admission might have the effect to rob the evidence of much of its fair and legitimate weight.'"

*See also* Alire v. United States, 313 F.2d 31, 34–35 (10th Cir. 1962), cert. denied, 373 U.S. 943, 83 S.Ct. 1554, 10 L.Ed.2d 699 (1963). The trial court did not abuse its discretion in admitting this testimony and properly limited the scope of the relevancy of the testimony by its cautionary admonition to the jury on the use the jury may make of such evidence.

### THE USE OF CHARTS AND TESTIMONY RELATING TO PERSONAL EXPENDITURES OF THE DEFENDANT.

The Government in presenting its case called as a witness Willie O. Hodges, a C.P.A. for the Internal Audit Division of the Bureau of Chief Postal Inspector, who testified as to the validity of Republic's financial statements, the fact of Republic's insolvency, and Brickey's personal use of Republic's funds. To illustrate his testimony Hodges used five charts, but these were not introduced into evidence.

Defendant argues that these charts were prejudicial in that Hodges failed to include certain transactions and to list certain sums on these charts. It is also contended that Hodges' description of one of Republic's cash transactions as check kiting was highly prejudicial to the defendant despite the cautionary instruction of the trial judge.

The Government views Hodges' testimony as relevant because it bore on the specific indictment charges that defendant obtained money from Republic for his own personal expenses. As to Hodges' usage of the charts, the Government points out that defendant made only one minor objection to the form or content of any of the five charts, which objection was sustained, and, therefore, the defendant waived any other error with regard to usage of the charts.

■ Since the challenged charts were not introduced into evidence we have not actually observed them. However, the failure of defendant's counsel to object and make the charts part of the record waives the alleged errors for a party cannot complain of an error acquiesced in by him. United States v. Richman, 369 F.2d 465, 467–468 (7th Cir. 1966); Lake City, Nettleton & Bay Rd. Imp. Dist. No. 1 of Craighead County, Ark. v. Luehrman, 113 F.2d 458, 469 (8th Cir. 1940). Furthermore, the usage and

admission of charts is largely within the discretion of the trial court and its action in permitting the usage of charts will not be reversed unless this discretion has been abused. Koolish v. United States, 340 F.2d 513, 533 (8th Cir. 1965). Since the court admonished the jury that the charts were not in evidence but were to be considered only as illustrative of Hodges' testimony and sustained the defendant's one minor objection, we find that there was no abuse of the court's discretion in permitting the usage of the five charts.

Hodges in testifying referred to a condition of check kiting in reviewing Republic's balance sheet of December 31, 1964. This reference was in the context of answering why he had discounted the cash reported on Republic's balance sheet dated December 31, 1964. Hodges testified that it was normal auditing procedure to examine deposits just prior to the statement date and to compare disbursements immediately after the statement date to determine whether funds that were deposited prior to the statement date were disbursed immediately thereafter. Hodges then said that Brickey had used this check kiting procedure to misrepresent Republic's cash account as of December 31, 1964, by $52,769.82. The defendant's objection to Hodges' characterization of check kiting was overruled, but the court did give a cautionary instruction that the jury could not convict the defendant of check kiting and that the evidence was admissible only in explaining the financial status of Republic on December 31, 1964. On appeal, the defendant argues that Hodges' check kiting testimony was reversible error as bearing upon a separate and unrelated offense.

Check kiting is a criminal offense under the Arkansas Hot Check Law. Ark. Stat.Ann. §§ 67-719 to 724 (1966 Replace.). We think, however, that the evidence tending to prove check kiting was admissible because it was relevant to the general indictment charge that Brickey filed a false financial statement for the year ending December 31, 1964, with the Arkansas Insurance Commissioner. "Relevant evidence which tends to prove a material fact in the case on trial is admissible even though it incidentally shows that the accused committed another offense at a different time and place." Fernandez v. United States, 329 F.2d 899, 908 (9th Cir.), cert. denied, 379 U.S. 832, 85 S.Ct. 62, 13 L.Ed.2d 40 (1964); Evenson v. United States, 316 F.2d 94, 96-97 (8th Cir. 1963); I Wigmore, Evidence § 216 (1940). Hodges' testimony with regard to check kiting was relevant in proving false representations in Republic Casualty's financial condition and was properly admitted by the trial court.

## PREJUDICIAL EFFECT OF THE GOVERNMENT CALLING A WITNESS WHO CLAIMED HIS FIFTH AMENDMENT PRIVILEGE

To prove misrepresentation of the true financial condition of Republic Casualty, the Government sought to show that a certificate of deposit held by Republic Casualty and listed on its balance sheet in the face amount of $100,000 was worthless. The certificate of deposit was issued by Home Industrial Bank of Denver, Colorado. Frank A. Blosser was president of that bank and also had a controlling interest in the Capital City Bank located in the Bahamas, which bank had also issued a certificate of deposit to Republic Casualty.

Blosser was subpoenaed to testify apparently as to the value of the certificates of deposit. This witness indicated before taking the witness stand that he intended to assert his Fifth Amendment privilege. The court was requested to examine the matter *in camera,* but refused to do so. The court thereupon ordered Blosser to take the stand. The fourth question asked the witness was if he had ever been connected with a bank in Colorado, to which the witness replied the answer might tend to incriminate him. The trial judge then asked if the witness honestly thought he would be incriminated by answering this question. After the witness stated he did on the advice of

his attorney, the court decided to explore the question in chambers.

The proceedings in chambers convinced the court that Blosser's claim of Fifth Amendment protection was appropriate. The court then instructed the jury that Blosser's right to take the Fifth Amendment with regard to certain of his activities with the Home Industrial Bank of Colorado was well taken, that Blosser's invocation of the privilege was to protect himself not the defendant, that the jury should not draw any inference against the defendant from Blosser's refusal to testify, and that the jury should consider Blosser a nullity and should forget him.

The Government maintains the trial court properly permitted Blosser to take the stand even after defense counsel's warning that Blosser would plead the Fifth Amendment for there was no indication as to which questions he might choose to answer nor as to which questions he would invoke his Fifth Amendment privilege. It is also asserted that the only practical way of resolving the dilemma was to put Blosser on the stand and ask him questions until he invoked his privilege against self-incrimination. The Government further argues to rule in favor of the position of the defendant would formulate a principle that whenever a witness notifies a trial court in advance that he plans to take the Fifth Amendment when asked to testify, the court must either automatically excuse him from testifying without determining whether the witness is sincere and unfaltering in his decision or delay the trial by an *in camera* proceeding.

■ The Supreme Court in the leading case of Namet v. United States, 373 U.S. 179, 185, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963), made clear that the issue we are concerned with involves only a claim of evidentiary trial error and does not reach constitutional dimensions. The court found that a witness' assertion of his Fifth Amendment privilege had been held to be reversible error in two instances: (1) "when the Government makes a conscious and flagrant attempt to build its case out of inferences arising from use of the testimonial privilege" and (2) where "a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination." *Id.* at 186–187, 83 S.Ct. at 1154. The Court went on to note that reversible error has generally not been found when the episodes were no more than minor lapses through a long trial, as in United States v. Hiss, 185 F.2d 822, 832 (2d Cir. 1950), cert. denied, 340 U.S. 948, 71 S.Ct. 532, 95 L.Ed. 683 (1951), 345 U.S. 942, 73 S.Ct. 830, 97 L.Ed. 1368 (1953), or when the trial judge instructed the jury to disregard the witness' refusal to answer. 373 U.S. at 187, 83 S.Ct. 1151. *See* United States v. Aiken, 373 F.2d 294, 298 (2d Cir.), cert. denied, 389 U.S. 833, 88 S.Ct. 32, 19 L.Ed. 2d 93 (1967).

■ The only question of substance asked Blosser was whether he had ever been connected with a bank in Colorado. This does not amount to a conscious and flagrant attempt by the Government to build its case out of the testimonial privilege. *See* United States v. Hoffman, 385 F.2d 501, 505 (7th Cir. 1967), cert. denied, 390 U.S. 1031, 88 S.Ct. 1424, 20 L. Ed.2d 288 (1968). Furthermore, there is no direct connection shown between Blosser and Brickey. Thus, Blosser's claim of privilege on the witness stand did not create an inference that Blosser was an accomplice of Brickey's in his fraudulent scheme nor did it create an inference that Brickey was involved in Blosser's machinations. We conclude there was no prosecutorial misconduct and Blosser's refusal to testify did not add critical weight to the Government's case in a form not subject to cross-examination.

■ The duty of a witness to testify is a vital and necessary part of our adversary trial system. Therefore, a witness cannot refuse to be sworn and must tell what he knows up to the point of his involvement in crime. Shushan v. United States, 117 F.2d 110, 117 (5th Cir.), cert. denied, 313 U.S. 574, 61 S.Ct. 1085, 85

L.Ed. 1531 (1941). As noted in Marcello v. United States, 196 F.2d 437, 441 (5th Cir. 1952): "The privilege against self-incrimination cannot be asserted in advance of the questions actually propounded in the examination or hearing." *See also* Mulloney v. United States, 79 F.2d 566, 580 (1st Cir. 1935), cert. denied, 296 U.S. 658, 56 S.Ct. 383, 80 L.Ed. 468 (1935); In re Schnitzer, 295 Mich. 736, 295 N.W. 478, 480 (1940).

The defendant has been afforded a fair trial at which he was well represented by adequate counsel. The evidence was sufficient to prove his guilt as charged beyond any reasonable doubt and we find no prejudicial error.

Judgment affirmed.