### In re GRAND JURY SUBPOENA TO KANSAS CITY BOARD OF PUBLIC UTILITIES.

#### No. 07–mc–212–KHV/JPO.

United States District Court,
D. Kansas.

Nov. 19, 2007.

---

## MEMORANDUM AND ORDER

JAMES P. O'HARA, United States Magistrate Judge.

### I. Introduction

This case involves an objection to a grand jury subpoena based on attorney-client privilege. On November 1, 2007, the undersigned U.S. Magistrate Judge, James P. O'Hara, convened an evidentiary hearing on a motion by the Kansas City Board of Public Utilities ("BPU") to quash certain portions of the subpoena, and to enter a protective order (doc. 4). BPU appeared at the hearing through retained counsel, R. Dennis Wright, John C. Aisenbrey, and Parthenia B. Evans, all of Stinson Morrison Hecker LLP ("Stinson"); BPU's in-house general counsel, Marc D. Conklin, also attended the hearing, but only as a representative of and witness for BPU. The United States of America (the "government") appeared through counsel, Raymond C. Bosch and Christopher Dudding, both of the U.S. Environmental Protection Agency ("EPA"), Eric F. Heimann of the Environment and Natural Resources Division of the U.S. Department of Justice, and a local Assistant U.S. Attorney, Marietta Parker. Karen Dillon and Mark Wiebe, newspaper reporters employed by *The Kansas City Star* ("*The Star*"), testified during the hearing, and they were accompanied by *The Star's* retained counsel, Sam L. Colville, of Holman Hanson & Colville, P.C. There were no other formal appearances.[1]

In addition to the evidence and arguments presented during the November 1, 2007 hearing, the court has considered all of the papers submitted by BPU and the government.[2] This memorandum and order, which

---

1. Presumably because of the pending grand jury investigation of BPU and indictments that potentially might ensue, Conklin's personal attorney, Todd R. Graves, attended the hearing, but he took no active role.

2. *The Star* takes no position on whether the court should quash the grand jury subpoena served on

BPU. However, earlier in these proceedings, based on the so-called "reporter's privilege," *The Star* sought to quash subpoenas that were issued by the government to Dillon and Wiebe to testify at the evidentiary hearing on BPU's motion to quash the grand jury subpoena; the court ruled against *The Star* on that issue (*see* docs. 36 & 44).

is not being filed under seal,[3] sets forth the court's findings of fact and conclusions of law. For the reasons set forth below, BPU's motion is granted in part and denied in part.

## II. Background

The record reflects that, on May 25, 2007, the court granted part of the instant motion and took the remainder under advisement (*see* doc. 11). For the benefit of context, the court notes that its May 25 order, in pertinent part, recites the relevant factual and procedural background as follows.

In 2003, BPU retained Stinson for advice on matters related to compliance with state and federal environmental laws. On November 14, 2004, Stanley A. Reigel, a Stinson attorney, provided Conklin, who as earlier indicated is BPU's general counsel, a detailed written liability analysis of more than seventy BPU projects (the "Reigel Analysis") (Government Ex. 1). The Reigel Analysis was clearly marked as confidential, attorney-client privileged, and attorney work product.

The Reigel Analysis was the subject of a confidential meeting held by BPU and Stinson on February 1, 2005. During this meeting, copies of the Reigel Analysis were distributed to those in attendance, including BPU employees, Stinson attorneys, consultants with the Burns & McDonnell engineering firm (which Stinson had specially retained to assist in the liability analysis), and an environmental consultant. Each of these individuals were advised as to the confidential and privileged status of the Reigel Analysis and were instructed to keep it secret.

About two years later, in late February and early March 2007, reporters from *The Star* and an "alternative" newspaper in the Kansas City area, *The Pitch,* informed BPU that they had received copies of the Reigel Analysis from an anonymous source; other individuals and organizations, including EPA, also received copies of the Reigel Analysis anonymously. Despite BPU's aggressive efforts to prevent publication of the Reigel Analysis, both newspapers published articles about it and, indeed, even posted copies of it on their respective Internet websites. In this regard, BPU sought and received a temporary restraining order from the Circuit Court of Jackson County, Missouri, but the restraining order was rendered unenforceable soon thereafter due to a preliminary writ of prohibition issued by the Missouri Court of Appeals.

On March 7, 2007, which was just shortly after the Missouri Court of Appeals' ruling, Dillon and Wiebe, *The Star's* reporters, were granted an interview with Conklin, as well as other BPU senior management, including Don L. Gray (general manager), Patrick Cassidy (director-environmental services), Darrell Dorsey (manager-electrical production and supply), and Susan Allen (public affairs officer). This interview, which was conducted at BPU's offices in Kansas City, Kansas, resulted in *The Star* running another story concerning the Reigel Analysis on March 8, 2007 (BPU Ex. 3).

On March 21, 2007, pursuant to the government's application, this court issued a subpoena to BPU's custodian of records to testify before a grand jury on April 25, 2007. Under paragraphs 5 and 6 of the subpoena, BPU was ordered to produce the Reigel Analysis and all documents that discuss said analysis. In the instant motion, BPU seeks

---

**3.** The instant motion seeks to quash a grand jury subpoena. Although the court is mindful of the general rule of secrecy that applies to grand jury proceedings (*see* Fed.R.Crim.P. 6(e)(2)), this memorandum and order does not mention let alone describe any evidence that has been part of the grand jury's proceedings. Instead, the court simply discusses matters that already have been the subject of several articles in *The Star* and other media outlets. Further, it should be noted that the court convened an informal telephone status conference with counsel for the government, BPU, and *The Star* on October 29, 2007 and indicated that because of the unique situation presented, absent good cause being shown, the court was disinclined to exclude anyone, whether it be representatives of the *The Star* or the public at large, during the November 1, 2007 evidentiary hearing. Neither the government nor BPU accepted the court's explicit invitation to brief the public access issue. In any event, the court hereby finds that an exception to the general rule of secrecy applies here. Specifically, in accordance with Fed.R.Crim.P. 6(e)(3)(E)(i), the court finds that, "in connection with a judicial proceeding," the disclosure of this very limited memorandum and order should be authorized, as disclosure will not have any adverse effect on the grand jury's deliberations.

to quash this portion of the subpoena on the basis that the Reigel Analysis and related documents are protected by the attorney-client privilege.[4] BPU also broadly seeks a protective order prohibiting the government from using the Reigel Analysis and related documents in the grand jury proceedings or in any subsequent judicial proceedings.

## III. Analysis

### A. Waiver

As explained in detail in its May 25, 2007 order, the court already has rejected the government's argument that the Reigel Analysis lost its privileged status simply on account of it being leaked to the newspapers and EPA by an anonymous source. The crux of the court's rationale was that BPU took reasonable precautions to protect the letter and BPU timely sought to protect the letter immediately after the leak was discovered.

■ But an issue remains whether BPU waived the attorney-client privilege during the March 7, 2007 interview by *The Star's* reporters. As indicated in the court's May 25 order, as a practical matter, this determination hinges on whether the BPU officials present at the interview discussed confidential aspects of the Reigel Analysis with Dillon and Wiebe (*see* doc. 11 at 4–7). The court has ruled (doc. 11 at 5), and BPU acknowledged during the November 1, 2007 evidentiary hearing, that BPU has the burden of showing BPU did *not* waive the attorney-client privilege.

As relates to the asserted waiver of BPU's attorney-client privilege, the court's analysis is governed by the Tenth Circuit Court of Appeals decision in *In re Qwest Communications International, Inc.*,[5] which in pertinent part stated:

The attorney-client privilege is "the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981). "Its purpose is to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Id.* The privilege serves the client's need for legal advice, but it also serves the attorney's need to receive complete information in order to give the proper advice. *See id.* at 390, 101 S.Ct. 677; *see also* 8 John Henry Wigmore, *Evidence* § 2291 (John T. McNaughton rev.1961); Edna Selan Epstein, *The Attorney–Client Privilege and the Work–Product Doctrine* 3 (4th ed.2001). Under the common law, a critical component of the privilege "is whether the communication between the client and the attorney is made in confidence of the relationship and under circumstances from which it may reasonably be assumed that the communication will remain in confidence." *United States v. Lopez,* 777 F.2d 543, 552 (10th Cir.1985).

Because confidentiality is key to the privilege, "[t]he attorney-client privilege is lost if the client discloses the substance of an otherwise privileged communication to a third party." *United States v. Ryans,* 903 F.2d 731, 741 n. 13 (10th Cir.1990). This court has stated, "the confidentiality of communications covered by the privilege must be jealously guarded by the holder of the privilege lest it be waived. The courts will grant no greater protection to those who assert the privilege than their own precautions warrant." *Id.* (quotation

---

**4.** BPU also originally sought to quash paragraphs 3 and 4 of the subpoena, which seek the so-called Best Available Control Technology Analysis performed by Burns & McDonnell and all related documents. However, as discussed in an order entered by the court on August 8, 2007 order (doc. 23), this issue is moot.

Further, the record reflects BPU originally sought an order requiring the government to return pages 2–15 of Exhibit B to the Reigel Analysis, which BPU claims Stinson inadvertently disclosed as an attachment to its original motion to quash (doc. 1), and which was *not* part of the version of the Reigel Analysis that was posted on the newspapers' websites. The court granted this portion of the instant motion in its order of May 25, 2007 (doc. 11).

**5.** 450 F.3d 1179 (10th Cir.2006).

and alteration omitted). This court has also held that "[c]ourts need not allow the claim of attorney-client privilege when the party claiming the privilege is attempting to utilize the privilege in a matter that is not consistent with the privilege." *United States v. Bernard,* 877 F.2d 1463, 1465 (10th Cir.1989). **"Any voluntary disclosure by the client is inconsistent with the attorney-client relationship and waives the privilege."** *Id.*[6]

The procedural context of the case at bar, to be sure, is atypical. Most attorney-client privilege issues that come before this court involve civil cases in which the client, for strategic, tactical, or other reasons, clumsily attempts to throw a shroud of secrecy over *all* communications with a lawyer and all work done by a lawyer, regardless of whether the communications involved the rendering of confidential legal advice, and regardless of whether the lawyer was performing legal work as opposed to a business function.[7] Because of this, and also because of the nature of what matters were discussed during the March 7, 2007 newspaper interview, the court believes it is important here to briefly review what is regarded as privileged and, just as importantly, what is not privileged.

The essential elements of the attorney-client privilege are: (1) where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal advisor, (8) except if the protection is waived.[8] The privilege also protects advice given by the lawyer in the course of representing the client.[9] The privilege protects communications with in-house counsel as well as outside attorneys.[10] The privilege, however, "is to be extended no more broadly than necessary to effectuate its purpose."[11]

"Not every communication between an attorney and client is privileged, only confidential communications which involve the requesting or giving of legal advice."[12] "The focal point of the protection afforded by the attorney-client privilege lies with 'communications' between attorneys and their clients."[13] And, although the privilege protects disclosure of substantive communication between attorney and client, "it does not protect disclosure of the underlying facts by those who communicated with the attorney."[14] There must be a connection between "the subject of the communication and the rendering of legal advice" for the attorney-client privilege to shield the communication from disclosure.[15] Legal advice must predominate for the communication to be protected.[16] The privilege does not apply where the legal advice is merely incidental to business advice.[17]

---

6. *Id.* at 1185 (emphasis added).

7. *See, e.g., Tilley v. Equifax Info. Servs., LLC,* No. 06–2304, 2007 WL 3120447, at * 1–3 (D.Kan. Oct.24, 2007) (defendant attempted to limit scope of its in-house general counsel's deposition, even though that lawyer was involved in underlying transactions with plaintiff).

8. *Marten v. Yellow Freight Sys., Inc.,* No. 96–2013, 1998 WL 13244, at *5 (D.Kan. Jan.6, 1998) (quoting *Great Plains Mut. Ins. Co. v. Mut. Reinsurance Bureau,* 150 F.R.D. 193, 196 n. 4 (D.Kan. 1993)).

9. *Upjohn Co. v. United States,* 449 U.S. 383, 390, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981).

10. *Id.* at 390, 101 S.Ct. 677.

11. *Great Plains Mut. Ins. Co.,* 150 F.R.D. at 196.

12. *Burton v. R.J. Reynolds Tobacco Co.,* 175 F.R.D. 321, 327 (D.Kan.1997) (citing *Fisher v. United States,* 425 U.S. 391, 403, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976); *United States v. Olano,* 62 F.3d 1180 (9th Cir.1995)).

13. *IMC Chems., Inc. v. Niro Inc.,* No. 98–2348, 2000 WL 1466495, at *8 (D.Kan. July 19, 2000) (quoting *Upjohn,* 449 U.S. at 395–96, 101 S.Ct. 677).

14. *Id.*

15. *Burton,* 175 F.R.D. at 328.

16. *Burton v. R.J. Reynolds Tobacco Co., Inc.,* 170 F.R.D. 481, 484 (D.Kan.1997) (citing *Leonen v. Johns–Manville,* 135 F.R.D. 94 (D.N.J.1990)).

17. *Id.* (citing *In re Brand Name Prescription Drugs Antitrust Litig.,* No. 94–C–897, 1995 WL 354268 (N.D.Ill. June 9, 1995)).

 Especially pertinent to the case at bar, it is important to keep in mind that a general description of the work performed by the attorney is not protected by the privilege.[18] Likewise, acts or services performed by an attorney during the course of the representation are not within the privilege because they are not communications.[19] Further, the subject matter of meetings with an attorney, the persons present, the location of the meetings, or the persons arranging the meetings are also not protected by the privilege.[20]

 Information is not privileged simply because it comes from an attorney.[21] The mere fact that one is an attorney does not render everything he does for or with the client privileged.[22] Minutes of meetings attended by attorneys are not automatically privileged, and business documents sent to attorneys are not automatically protected.[23]

BPU asserts that nothing was said by Conklin or any of their other employees during the March 7, 2007 interview about Stinson's confidential legal advice. Further, BPU asserts that the reporters simply wrote the March 8, 2007 article based on non-privileged information that was publicly available, information the reporters could discern from the previously leaked Reigel Analysis, and non-privileged information that was discussed during the interview. In contrast, the government asserts that BPU employees did discuss the contents of the Reigel Analysis during the interview, thereby waiving the attorney-client privilege.

During the all-day evidentiary hearing on November 1, 2007, the court heard testimony from Dillon, Wiebe, and Conklin about the interview at BPU's offices on March 7, 2007. The court also had the benefit of the contemporaneous handwritten notes taken during the interview by the two reporters.[24]

For purposes of any appellate review of the undersigned magistrate judge's decision, and in particular the factual findings made in this order, the court will make specific credibility determinations. The court does so, having had the opportunity to closely observe the demeanor of the witnesses while providing extensive testimony.

As relates to Dillon, the court has no reason to question she is a competent newspaper reporter. But on the very narrow factual issue presented, neither Dillon's oral testimony nor her interview notes allow the court to find her credible, i.e., with regard to the *details* of what specifically was said by whom during the interview. Most notably, even the government acknowledged during oral argument that Dillon was completely wrong about the fundamental premise of whether Stinson, in conducting the environmental risk analysis, was tasked with evaluating potential regulatory violations from the perspective of EPA or BPU; everyone but Dillon clearly understood that it was the former, which inescapably flows from the fact that the Reigel Analysis expressly states that it was intended to be a "conservative" risk analysis by the law firm for its client.

Likewise, the court has no reason to question Conklin's competence as a lawyer. But here again, on the narrow factual issue presented, the court finds much of Conklin's testimony lacking in credibility. With the

---

**18.** *Id.* (citing *United States v. Olano,* 62 F.3d 1180 (9th Cir.1995)).

**19.** *Id.* (citing *United States v. Brickey,* 426 F.2d 680 (8th Cir.1970)).

**20.** *Id.* at 484–85 (citing *United States v. Pappadio,* 346 F.2d 5 (2d Cir.1965)).

**21.** *Id.* at 485 (citing *United States v. Defazio,* 899 F.2d 626 (7th Cir.1990); *In re Brand Name Prescription Drugs Antitrust Litig.,* 1995 WL 354268).

**22.** *Id.* (citing *United States v. Bartone,* 400 F.2d 459 (6th Cir.1968)).

**23.** *Id.* (citing *Simon v. G.D. Searle & Co.,* 816 F.2d 397 (8th Cir.1987)).

**24.** *See* Government Ex. 6 (Dillon) and BPU Ex. 2 (Wiebe). Without objection by BPU, Dillon tape-recorded all of the interview, but in the ordinary course of her work on other newspaper stories she recorded over that tape, so unfortunately the best evidence of what said during the interview is no longer available.

It should be noted that, although Conklin did not take any notes during the interview, some of the other BPU representatives took at least a few notes. But none of that material was offered into evidence during the hearing.

benefit of 20–20 hindsight, Conklin was candid enough to acknowledge that the decision BPU made to grant the interview "was not a good idea."[25] But beyond that Conklin provided testimony that was largely self-serving, if not evasive.

Wiebe, in contrast to Dillon and Conklin, was responsive, precise, and objective during his testimony. As a result, he was quite credible. Further, his notes of the interview have the benefit of being legible and understandable.

It is uncontroverted that Conklin made it quite clear at the beginning and end of the March 7, 2007 interview session that, as evidenced by the fact that BPU sued *The Star* and *The Pitch* in Missouri state court, BPU had done everything it possibly could to maintain its attorney-client privilege with regard to the leaked Reigel Analysis. Moreover, although BPU ultimately failed in the Missouri litigation, it is uncontroverted that Conklin clearly stated at the beginning of the interview that BPU felt it very important to continue doing everything possible to maintain the attorney-client privilege, i.e., BPU obviously did not intend to waive its privilege through the interview process.

Based on Conklin's substantial prior dealings with Wiebe, who generally handled the Kansas City, Kansas beat for *The Star*, Conklin went into the interview believing that it would last no more than ten to fifteen minutes. However, as it turned out, Dillon asked most of the questions during the interview (environmental issues are her assigned area of responsibility), and it was fairly apparent to all present that Dillon, at least to some extent, was framing her questions based on information contained in the Reigel Analysis. The interview ended up taking at least ninety minutes, and perhaps as long as two full hours.

Although Dillon took the lead in terms of asking questions during the March 7, 2007 interview, Wiebe wrote most of the article based on the interview which was published in *The Star* the following day. Notably, the March 8 article is devoid of any mention of any specific confidential legal advice by Stinson to BPU (*see* BPU Ex. 3). It is reasonable to assume that, if such confidential advice had been disclosed during the interview, it would have ended up in Wiebe's article.

The government argues that, despite what Conklin said about BPU's intent to maintain the attorney-client privilege, and despite what Conklin assumed about how long the interview would last, the interview got out of hand, in that Conklin ultimately answered questions posed by Dillon in a way that divulged the substance of confidential advice BPU had received from Stinson. Clearly, this situation is tantamount to a child playing with matches (other, less delicate analogies also spring readily to mind). In any event, after hearing all the testimony and reviewing all the documentary evidence in the record (which of course is more extensive than the reporters' notes), the court finds that neither Mr. Conklin nor any other BPU employee disclosed the substance of any of Stinson's confidential legal advice during the March 7, 2007 interview. During the hearing, the undersigned directly asked both Dillon and Wiebe to describe any such specific legal advice that was discussed during the interview; neither was able to point to anything in this regard. All that was discussed during the interview were non-privileged matters, such as the general circumstances leading up to the Reigel Analysis being commissioned, and how it was conducted with regard to retrieval of documents. Therefore, the court finds that BPU did not waive its attorney-client privilege with regard to the Reigel

---

25. Tr. at p. 238, ll. 19–20 (doc. 50–5 at 38). It should be noted here that no Stinson lawyer was even notified of the fact that the interview was scheduled at BPU's offices. The court realizes that BPU may have between that proverbial rock and a hard place, meaning that political and public relations considerations ultimately drove BPU's decision to grant *The Star's* request for interview. Since BPU is a part of a governmental entity, and since BPU had just unsuccessfully engaged in very high-profile litigation with *The*

*Star* (the largest newspaper in BPU's service area), BPU concluded that it was necessary to "explain" its position. Whatever the political, "PR," or business considerations might have been, the decision to grant this particular interview represented exceptionally poor legal judgment. The court does not mean to suggest that lawyers and their clients ought never talk to the press. But this case starkly demonstrates the risks associated with newspaper interviews about legal matters.

Analysis during the interview on March 7, 2007 by *The Star*.

## B. Crime–Fraud Exception

 Independent of the waiver issue discussed above, the government argues that BPU's motion to quash must be denied because the Reigel Analysis falls under the so-called crime-fraud exception to the attorney-client privilege. Here the argument is that BPU was using the Reigel Analysis in furtherance of ongoing violations of the law. BPU naturally denies it was engaged in any criminal or fraudulent conduct, and argues the government has failed to make a prima facie showing otherwise.

 The attorney-client privilege, though extremely important, is not absolute. Among other exceptions, the "attorney-client privilege does not apply where the client consults an attorney to further a crime or fraud." [26] The party claiming the exception applies "must present prima facie evidence that the allegation ... has some foundation in fact." [27] The trial court has discretion to determine whether the party has established a prima facie case.[28] It is a bit unclear what constitutes a prima facie case for establishing the crime-fraud exception under federal law.[29] Some circuits have attempted to define precisely what the standard requires, but the Tenth Circuit has not yet articulated precisely what is required to establish a prima facie case under the crime-fraud exception.[30]

The government asserts that when BPU hired Stinson to assess the former's potential liability, BPU was engaged in ongoing violations of the Clean Air Act, 42 U.S.C. § 7401 et seq. BPU counters this assertion by arguing that the liability assessment set forth in the Reigel Analysis is nothing more than typical legal advice from an attorney (Stinson) to a client (BPU), in which the attorney evaluates the existing case law in a light most favorable to the adverse party (EPA), and then recommends a course of action to the client. BPU further argues that analyzing whether a client should settle, negotiate, or wait for action by the adverse party, even a regulator like EPA, is entirely appropriate and does not mean the advice is given in furtherance of criminal or fraudulent conduct.

As mentioned earlier, it is not clear exactly what the prima facie standard requires. Regardless, the court is wholly unpersuaded the Reigel Analysis falls into the crime-fraud exception under *any* of the above-stated standards. Upon review of the parties' papers and, most importantly, the Reigel Analysis itself, and in consideration of the positions staked out at the evidentiary hearing, the court finds the government has not shown prima facie evidence of violations of the Clean Air Act.

The court agrees with BPU that the Reigel Analysis is simply an example of a liability analysis performed by an attorney for a

26. *Motley v. Marathon Oil Co.*, 71 F.3d 1547, 1551 (10th Cir.1995) (internal quotation omitted).

27. *Id.*

28. *Id.*

29. *United States v. Zolin*, 491 U.S. 554, 563–64 n. 7, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989) ("The quantum of proof ... remains [] subject to question.").

30. *See In re Grand Jury Subpoenas*, 144 F.3d 653, 660 (10th Cir.1998) (citing *In re Richard Roe, Inc.*, 68 F.3d 38, 40 (2d Cir.1995) (probable cause to believe a crime or fraud has been committed); *Haines v. Liggett Group Inc.*, 975 F.2d 81, 95–96 (3d Cir.1992) (evidence that if believed by the fact finder would be sufficient to support a finding that the elements of the crime-fraud exception were met); *In re Int'l Sys. & Controls*

*Corp. Sec. Litig.*, 693 F.2d 1235, 1242 (5th Cir. 1982) (evidence such as will suffice until contradicted and overcome by other evidence); *United States v. Davis*, 1 F.3d 606, 609 (7th Cir.1993) (evidence presented by the party seeking application of the exception is sufficient to require the party asserting the privilege to come forward with its own evidence to support the privilege); *In re Grand Jury Proceedings (Appeal of Corporation)*, 87 F.3d 377, 381 (9th Cir.1996) (reasonable cause to believe attorney was used in furtherance of ongoing scheme); *In re Grand Jury Investigation (Schroeder)*, 842 F.2d 1223, 1226 (11th Cir.1987) (evidence that if believed by the trier of fact would establish the elements of some violation that was ongoing or about to be committed); *In re Sealed Case*, 107 F.3d 46, 50 (D.C.Cir.1997) (evidence that if believed by the trier of fact would establish the elements of an ongoing or imminent crime or fraud)).

client. To the court, it seems quite clear that, as contrasted with furthering a client's commission of a crime, the Reigel Analysis reflects precisely what good lawyers are supposed to do, i.e., help their clients identify, understand, and evaluate legal risks, so the clients can proceed to make appropriate business decisions about how to manage those risks. Particularly in a regulated field like the one in which BPU operates, there are legal risks at every turn. Just because a lawyer advises a client that something the client has done (or, as in this case, continues to do) may be somewhat difficult to defend in court or in an administrative proceeding surely is not assisting the client in the commission of a crime. Significantly more is needed before the crime-fraud exception is triggered.

It is uncontroverted the Reigel Analysis looked at relevant documents for more than seventy BPU projects from a conservative, "worst-case" scenario in light of evolving legal precedent and EPA's more aggressive enforcement stance. This, as earlier indicated, meant worst case for BPU, not EPA. With this limited perspective, forty-one of the reviewed projects were deemed by Stinson to be "probably defensible" if challenged by EPA. The other projects were equally divided into two groups deemed either "questionable" or "probably not defensible." Significantly, *none* of the projects were deemed *completely* indefensible. And certainly the Reigel Analysis contains no admissions that BPU was violating any federal or state environmental laws. Even the government acknowledged during oral argument that, had the Reigel Analysis been written from something other than a conservative, worst case scenario, it is reasonable to infer that at least some projects would move out of the "probably not defensible" category. In any event, with all due respect to the government, the court does not believe there is *anything* in the Reigel Analysis that can *reasonably* be construed as rising to the level of prima facie evidence that crime was being committed.

C. Privilege Log

Pursuant to the court's May 25, 2007 order (doc. 11), BPU submitted a privilege log which listed documents related to the Reigel Analysis. The parties agreed during an August 6, 2007 hearing that the court should defer ruling on the discoverability of these documents until after the evidentiary hearing regarding the Reigel Analysis, because as a practical matter the court's ultimate ruling on the latter will drive the handling of the former. This issue, given the rulings in this order, now appears to be moot.

IV. Conclusion and Order

To recap, the court finds BPU did not waive its attorney-client privilege by granting the March 7, 2007 interview to *The Star*. And the court finds the crime-fraud exception to the attorney-client privilege is inapplicable to this case.

The still-pending parts of BPU's motion to quash and for entry of a protective order (doc. 4) are granted in part and denied in part. The court hereby quashes paragraphs 5 and 6 of the grand jury subpoena that was served on BPU. The court declines to approve the broad form protective order proposed by BPU (doc. 51). Instead, the court simply orders the government to immediately return to BPU all copies of the Reigel Analysis. The government also shall immediately destroy all documents, including notes, made or kept in any medium, which summarize or describe the Reigel Analysis. The government shall not refer to or make any use of the Reigel Analysis during the pending grand jury proceedings or in any subsequent judicial proceeding.

IT IS SO ORDERED.